**E-FILED**
Monday, 24 March, 2008  11:01:33 AM
Clerk, U.S. District Court, ILCD

1

1          IN THE UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF ILLINOIS (Urbana)
2

3     UNITED STATES OF AMERICA,)
                               )
4                  Plaintiff, )
                               )
5        -vs-                  )    No. 07-20044
                               )
6     ROBERT MICHAEL QUINLAN,  )
                               )
7                  Defendant. )

8                        SENTENCING HEARING

9
           REPORT OF PROCEEDINGS taken before Fran
10    Anderson, a Certified Shorthand Reporter and Notary
      Public within and for the County of McLean and State
11    of Illinois, at U.S District Court, 201 South Vine
      Street, Urbana, Illinois, before the HONORABLE
12    MICHAEL P. McCUSKEY, on Wednesday, February 13, 2008.

13
           APPEARANCES:
14
               Eugene L. Miller
15             Assistant U.S. Attorney
               201 South Vine
16             Urbana, IL  61801
               217-373-5875
17             On behalf of Plaintiff

18             John C. Taylor
               Federal Public Defender
19             300 West Main Street
               Urbana, IL  61801
20             217-373-0666
               On behalf of Defendant
21

22

23

24

25

2

```
 1                    I N D E X

 2                                          Page
   WITNESS:
 3
       Daniel J. Caswell
 4
       Examination by Mr. Miller...... 11, 33
 5     Examination by Mr. Taylor.......... 29

 6     Ken Massey

 7     Examination by Mr. Miller........ 34

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  This is the United States of

2    America versus Robert Michael Quinlan,

3    Q-u-i-n-l-a-n, case number 07-20044.  Present in

4    open court is Robert Michael Quinlan, accompanied

5    by his attorney, John C. Taylor.  The United

6    States is represented by its Assistant

7    U.S. Attorney, Eugene Miller; representing the

8    probation office for the Central District of

9    Illinois, Donna S. Brown.

10          On April 4, 2007, a one-count indictment

11   was filed in the United States District Court in

12   Urbana.  The indictment charged from on or about

13   March 2006 and continuing through at least about

14   November 14, 2006, in Iroquois County, in the

15   Central District of Illinois and elsewhere,

16   Robert Michael Quinlan conspired with others to

17   manufacture methamphetamine, and the conspiracy

18   involved five grams or more.

19          On September 7, 2007, Mr. Quinlan

20   appeared before me for a change of plea hearing.

21   It was an open plea without a written plea

22   agreement.  Mr. Quinlan pleaded guilty to the

23   matter contained in the indictment.  The Court

24   found the plea to be freely, voluntarily,

25   knowingly, and intelligently made, and judgment

4

1  of conviction was entered, jury trial demand
2  vacated.
3          Daniel J. Caswell and Jessica L.
4  Patterson were indicted in U.S. District Court
5  case no. 06-20066 on charges of conspiracy to
6  manufacture methamphetamine involving five grams
7  or more, Count 1; possession of pseudoephedrine
8  to be used in the manufacture of methamphetamine,
9  Count 2; and unlawful purchase of
10 pseudoephedrine, Count 3, which was only as to
11 Caswell.
12          Caswell pleaded guilty on December 19,
13 2006, to Count 1.  He was sentenced on April 19,
14 2006, to a hundred and twenty months in the
15 Federal Bureau of Prisons, followed by eight
16 years of supervised release.  Ms. Patterson
17 pleaded guilty to Count 1 on December 18, 2006.
18 She was sentenced on April 19, 2007, to 87 months
19 in the Bureau of Prisons, with four years
20 supervised release to follow.
21          Following the plea, the Court ordered
22 Probation to prepare a presentence investigation
23 report.  Donna S. Brown is present.  She has
24 prepared the presentence report pursuant to the
25 Court's order.  It was first prepared on November

5

1   1st, revised on December 11th.

2           Mr. Miller, she reports on page 21 that

3   you had received and reviewed the presentence

4   report and advised that the Government had no

5   objections to it; is that correct?

6           MR. MILLER:  It is, Your Honor.

7           THE COURT:  Mr. Taylor, Ms. Brown

8   reports on page 21 that in a letter dated by you

9   on November 28, 2007, you advised that there were

10  pending unresolved objections; that was pages 4

11  through 9, paragraphs 7 through 14.  Those

12  objections relate to the relevant conduct, and

13  that -- those pages that I just cited in talking

14  about relevant conduct go through a lengthy

15  calculation on paragraph 14 where Probation has

16  recounted many incidents which the -- Probation

17  says is accountable for transactions which Mr.

18  Quinlan had with his coconspirators in purchasing

19  or arranging for the purchase of products

20  containing pseudoephedrine.  That goes on from

21  page 6, page 7, 8, and 9.  Following those

22  calculations -- well, I'm trying to figure out

23  how much that adds, Ms. Brown.

24          MS. BROWN:  He's accountable for 1,512

25  grams.

1              THE COURT:  This is paragraph 22,
2  right?
3              MS. BROWN:  That's right.
4              THE COURT:  So that relevant conduct
5  calculation establish a base offense level of
6  32.  And, Mr. Taylor, you are objecting to that
7  calculation?
8              MR. TAYLOR:  We are, Your Honor, but may
9  I specify, exactly?
10              THE COURT:  Yes.
11              MR. TAYLOR:  Recently, objections have
12  become the bane of this Court, and we want to
13  keep it very simple today, Your Honor.  We are
14  not in any way objecting to Ms. Brown's
15  calculations, which are somewhat conservative.
16  She has correctly calculated using the tables.
17  Our only objection is to the amount of that total
18  amount, Your Honor, which should be attributed to
19  my client as relevant conduct.  I hope that
20  clarifies, Your Honor, somewhat where we're
21  going.
22              Thank you.
23              THE COURT:  Yes.  Now, that, Mr.
24  Quinlan, is the first unresolved objection that
25  Mr. Taylor has filed on your behalf.  Do you

1    agree and join with his objection?

2            THE WITNESS:  Yes.

3            THE COURT:  The next unresolved

4    objection, Mr. Taylor, is that Mr. Quinlan

5    objects to the four-level increase for being a

6    leader and organizer in the conspiracy, and you

7    object to that four-level increase; is that

8    right, Mr. Taylor?

9            MR. TAYLOR:  We do, Your Honor.

10            THE COURT:  Mr. Quinlan, do you join Mr.

11    Taylor in that objection?

12            THE WITNESS:  Yes, Your Honor, I do.

13            THE COURT:  Okay, those two objections

14    laid out on page 21, 22.  And, Mr. Taylor, those

15    are the only two objections you've filed to the

16    presentence report; is that correct?

17            MR. TAYLOR:  That's correct, Your

18    Honor.

19            THE COURT:  And did Mr. Quinlan give you

20    any additional objections to the presentence

21    report?

22            MR. TAYLOR:  He did not, Your Honor.

23            THE COURT:  Mr. Quinlan, is that

24    correct, that those are the only objections you

25    have to the presentence report?

1               THE WITNESS:  Yes, sir.  At this time,

2    yes.

3               THE COURT:  Well, this is the sentencing

4    time, so we don't have another date.  So if you

5    have additional objections other than the

6    calculation to the offense level on relevant

7    conduct and the calculation on the four-level

8    increase for leader or organizer, which those

9    comprise 36 of the 38 points in the offense

10   level, if you have any additional objections that

11   go to the offense level, criminal history

12   category, or the advisory guideline range or

13   statutory provisions, now is the time to raise

14   them, and you may, even though Mr. Taylor has

15   not.  So do you have any additional objections

16   other than the two that Mr. Taylor has?

17              THE WITNESS:  No.  What he said was

18   right.

19              THE COURT:  Okay, and you go along with

20   that?

21              THE WITNESS:  Right.

22              THE COURT:  And you understand that if

23   you have anything else that would affect your

24   sentencing as far as the offense level, criminal

25   history category, advisory guideline sentencing

1  range, or statutory factors you could raise those

2  objections separate and apart from Mr. Taylor, if

3  you wanted to; do you understand you have that

4  right?

5          Well, just tell me what's going through

6  your mind.  We've got all afternoon.

7          MR. TAYLOR:  Let me make this simple,

8  Your Honor.  He wants to testify as to his

9  involvement in the conspiracy in terms of

10  relevant conduct.  What I'm advising is he can do

11  that if he wishes, but all Your Honor wants to

12  know right now is are there any other objections,

13  other than relevant conduct.

14          THE COURT:  Other than relevant conduct

15  or leader and organizer.

16          MR. TAYLOR:  And there are none.

17          THE WITNESS:  No.

18          THE COURT:  Okay.  Anybody force you to

19  say that?

20          THE WITNESS:  No.

21          THE COURT:  Threaten you in any way?

22          THE WITNESS:  No.

23          THE COURT:  Promise you to agree to only

24  have the two objections that Mr. Taylor is

25  raising?

1          THE WITNESS:  No.

2          THE COURT:  The Court finds we have two

3    unresolved objections that we will hear evidence

4    on today.

5          How does the Government wish to

6    proceed?

7          MR. MILLER:  Your Honor, we have two

8    witnesses, Daniel Caswell, and then in discussing

9    the matter with Mr. Taylor we would also present

10   the testimony of Agent Ken Massey, who would

11   testify as to numerous interviews that he

12   conducted and the Pseudoephedrine Law to support

13   the information contained in the presentence

14   report.

15         THE COURT:  Okay.  And so Mr. Caswell is

16   the same Daniel J. Caswell that was part of case

17   no. 06-20066?

18         MR. MILLER:  Yes, Your Honor.

19         THE COURT:  And Mr. Caswell pleaded

20   guilty before me on December 19, 2006; he was

21   sentenced on April 19, 2007, to 120 months in the

22   Federal Bureau of Prisons with eight years of

23   supervised release.

24         You may call your witness, Mr. Miller.

25         MR. MILLER:  Your Honor, we call Daniel

1  Caswell.

2                      DANIEL J. CASWELL,

3  called as a witness, after having been first duly

4  sworn, was examined and testified as follows:

5                      DIRECT EXAMINATION

6  BY MR. MILLER:

7      Q.    Could you please tell us your name and

8  spell your last name for the court reporter.

9      A.    Daniel Caswell, C-a-s-w-e-l-l.

10      Q.    And you're currently in the custody of

11  the Federal Bureau of Prisons?

12      A.    Yes, sir.

13      Q.    You were sentenced in this court,

14  actually, for conspiracy to manufacture

15  methamphetamine from April to June of 2006 in

16  Iroquois County, Illinois; is that correct?

17      A.    Yes.

18      Q.    And you've already been sentenced for

19  that offense?

20      A.    That's right.

21      Q.    And you are testifying here today

22  pursuant to a cooperation agreement you entered

23  into with the United States?

24      A.    Yes, sir.

25      Q.    Let me just get some background.  How

1  old are you, Mr. Caswell?

2      A.    I'm 26.

3      Q.    Did you grow up in east central

4  Illinois?

5      A.    Yes, sir.

6          THE COURT:   You've going to have to

7  speak a little louder.

8  BY MR. MILLER:

9      Q.    And did you graduate from high school in

10  Milford, Illinois in Iroquois County in the year

11  2000?

12      A.    Yes, sir.

13      Q.    Sort of begin with your methamphetamine

14  activity, were you arrested in February of 2004

15  in Champaign County, Illinois in possession of

16  pseudoephedrine that was to be used in

17  manufacture of methamphetamine?

18      A.    Yes, sir.

19      Q.    And did you receive 24 months probation

20  for that?

21      A.    Yes, sir.

22      Q.    While you were on probation for that in

23  January of 2005, did you check yourself into the

24  hospital in Watseka, Illinois?

25      A.    Yes, sir.

2:07-cr-20044-MPM-DGB    # 26    Page 13 of 95

1    Q.   And why was it you checked yourself into

2  the hospital at Watseka?

3    A.   I had double pneumonia, two blood

4  infections, and dehydration from methamphetamine.

5    Q.   That was from using methamphetamine?

6    A.   Yes, sir.

7    Q.   And were you, in fact in the hospital

8  for approximately eight days?

9    A.   That sounds about right, yes, sir.

10    Q.   After you were released from the

11  hospital, you were arrested three days later,

12  again in possession of pseudoephedrine pills to

13  manufacture methamphetamine?

14    A.   Yes, sir.

15    Q.   And for that arrest were you ultimately

16  sentenced to what they call boot camp in the

17  state system in June of 2005?

18    A.   Yes, sir.

19    Q.   And did you complete your stay at the

20  DuQuoin boot camp on November 30th of 2005?

21    A.   Yes, sir.

22    Q.   Now, before you went to boot camp,

23  besides possessing the pills, were you engaged in

24  manufacturing methamphetamine?

25    A.   Yes.

14

1    Q.    And you knew how to manufacture

2    methamphetamine?

3    A.    Yes, sir.

4    Q.    Now, before you went to the boot camp,

5    did you know Robert Michael Quinlan?

6    A.    Yes, sir.

7    Q.    And what was the nature of your

8    association with him before you went to the boot

9    camp?

10    A.    At the time, he was just funding some of

11    my cooks because I did not have the money to buy

12    the supplies.

13    Q.    And when you say funding some of your

14    cooks, what does that mean?

15    A.    He gave me money so I could buy the

16    supplies and buy methamphetamine.

17        THE COURT:  Why would he do that?

18        THE WITNESS:  Because I would pay him

19    back as money and give him methamphetamine for

20    his own personal use.

21    BY MR. MILLER:

22    Q.    Now, at that time, to your knowledge,

23    was he involved in cooking methamphetamine?

24    A.    No.

25    Q.    And let me ask you, do you see in the

1   courtroom here today the person who you referred

2   to I'm going to ask you about, Robert Michael

3   Quinlan?

4        A.   Yes, sir.

5        Q.   And would you please point him out to

6   the Court.

7        A.   Sitting there in the orange

8             MR. MILLER:  Your Honor, we'd request

9   that the record reflect that the witness has

10  identified the defendant.

11            THE COURT:  The record will so reflect.

12  BY MR. MILLER:

13       Q.   Now, after you got out of boot camp,

14  were you placed on house arrest?

15       A.   Yes, sir.

16       Q.   And that was from about November of 2005

17  to March of 2006?

18       A.   Yes, sir.

19       Q.   Now, during the time you were on house

20  arrest, were you able to resume your

21  methamphetamine use?

22       A.   Slightly, yes, sir.

23       Q.   And how did that occur?

24       A.   My girlfriend brought me some, Mr.

25  Quinlan brought me some.  That's basically it.

16

1       Q.    And who was your girlfriend at that
2  time?
3       A.    Jessica Patterson.
4       Q.    And she was also a codefendant of yours
5  in the conspiracy charge for which you pled
6  guilty?
7       A.    Yes, sir.
8       Q.    Now, at that time that they brought you
9  some, that was not methamphetamine that you had
10  manufactured?
11      A.    No, sir.
12      Q.    And did you learn who was manufacturing
13  that methamphetamine?
14      A.    Yes, sir.
15      Q.    And who was?
16      A.    Mr. Quinlan, sir.
17      Q.    In fact, during that time after you were
18  released, did you -- were there discussions about
19  the defendant manufacturing methamphetamine with
20  Jessica and with the defendant?
21      A.    I'm sorry, sir?
22      Q.    That was an inartful question.
23  Basically, you indicated he had not been
24  manufacturing methamphetamine before you went to
25  boot camp?

17

```
 1      A.   Right.

 2      Q.   Did you subsequently learn that he had

 3 become a person who had become engaged in

 4 manufacturing methamphetamine?

 5      A.   Yes, sir.

 6      Q.   How did you obtain that informing?

 7      A.   A friend of mine and Jessica, and of

 8 course him bragging to me.

 9      Q.   Who bragging to you?

10      A.   The defendant.

11      Q.   Now, there was a log that indicated that

12 you purchased pseudoephedrine pills from a

13 Wal-Mart pharmacy in Danville in February of

14 2006; do you recall that?

15      A.   Yes.

16      Q.   And that was during the time you were

17 still under house arrest?

18      A.   Yes.

19      Q.   And what was the purpose of purchasing

20 those pseudoephedrine pills?

21      A.   To manufacture.

22      Q.   Methamphetamine?

23      A.   Yes, sir.

24      Q.   And who used those pills to manufacture

25 methamphetamine?
```

1    A.   Quinlan did, sir.

2    Q.   Now, after you got off on house arrest,

3  did you begin engaging in manufacturing

4  methamphetamine with the defendant, Michael

5  Quinlan?

6    A.   Yes, sir.

7    Q.   And let me just ask you, from about

8  March of 2006 until your arrest in July of 2006,

9  did you engage on multiple occasions in

10  manufacturing methamphetamine with the defendant?

11    A.   Yes, sir.

12    Q.   And to the best -- your best estimate or

13  recollection, approximately how many times would

14  you have manufactured methamphetamine with the

15  defendant during that period?

16    A.   Twenty or more, sir.

17    Q.   How many -- was there a typical number

18  of times in a week that you might manufacture

19  methamphetamine?

20    A.   Usually twice, sometimes a third,

21  depending on how fast we used it.

22    Q.   And how much methamphetamine -- on a

23  typical cook, how much methamphetamine would you

24  produce?

25    A.   Anywhere from five to ten, on average,

1    depending on how many boxes of pills we used.

2        Q.    When you say five to ten --

3        A.    Five to ten grams.

4        Q.    And walk us through this in sort of a

5    typical cook; you said depending on how many

6    boxes you used.  Walk us through the ingredients

7    you would use in a typical cook of

8    methamphetamine with the defendant.

9        A.    Let's say ten boxes of pills.

10       Q.    And that's pseudoephedrine pills?

11       A.    Pseudoephedrine pills, six to eight

12   batteries, a box of Ozark camp fuel --

13       Q.    And let me stop you, when you say

14   batteries, would it need to be a special type of

15   battery?

16       A.    E2 lithium batteries, the double A's.

17       Q.    Okay.

18       A.    A quart of anhydrous, sulfuric acid, and

19   some instant ocean sea salt.

20       Q.    Let's go through those ingredients.

21   Now, how was it that you and Mr. Quinlan obtained

22   the pseudoephedrine pills?

23       A.    We bought them.  We also had other

24   people go and buy them for us, and there was also

25   other people recruited to buy, I mean further

1 down the line.

2      Q.    And let's talk about, first of all, so

3 you bought pills that were then used to

4 manufacture methamphetamine by you and the

5 defendant?

6      A.    Yes, sir.

7      Q.    And you know that the logs had shown

8 eight separate purchases.  Let me just ask, then,

9 about those.  You already talked about the

10 Danville purchase in February.  In April,

11 according to the log, you purchased

12 pseudoephedrine pills at 1:15 p.m. at Wal-Mart in

13 Watseka, followed by another purchase at 2:10

14 p.m. at CVS in Kentland, Indiana; do you recall

15 that?

16      A.    Yes, sir.

17      Q.    And why was it that on the same day you

18 would purchase one box of pills in Watseka,

19 Illinois and about an hour later purchase a box

20 in Kentland, Indiana?

21      A.    We were hoping not to get caught.

22      Q.    And so you didn't want to buy multiple

23 boxes at that time?

24      A.    Right.

25      Q.    Were there also restrictions on the

1  amount?

2      A.    As far as I -- I believe there was a one

3  box limit.

4      Q.    When you would buy the box, did you have

5  to present identification?

6      A.    Yes.

7      Q.    And then were you required to sign the

8  logs?

9      A.    Yes, sir.

10     Q.    Then also in -- on April 22nd, '06, you

11  indicated you purchased bills at CVS in Watseka,

12  Illinois, and Jessica Patterson purchased pills

13  on that day as well; do you recall that?

14     A.    Yes.

15     Q.    So there were occasions that you and Ms.

16  Patterson would purchase pills on the same day?

17     A.    Yes, sir.

18     Q.    Again, in May of -- May 7th of '06

19  purchased some pills in Hoopeston, followed by

20  pills in Kentland, Indiana; do you recall that?

21     A.    Yes, sir.

22     Q.    And then on June 6th, again purchasing

23  pills at the CVS in Kentland, Indiana, later that

24  same day purchasing pills at the Wal-Mart in

25  Watseka, Illinois; do you recall that?

1     A.   Yes, sir.

2     Q.   And when you say not getting caught,

3  would that include going to different states to

4  avoid detection?

5     A.   Different states, different stores, as

6  long as it just wasn't back to back on each

7  store.

8     Q.   Now, those are the records that we

9  talked about here.  Are there other purchases

10  that you recall that simply records hadn't been

11  obtained?

12     A.   Fowler, Indiana, some in Kankakee,

13  Danville, and that's all to my knowledge for

14  myself self.

15     Q.   And those would all be pills that were

16  used to manufacture methamphetamine?

17     A.   Yes, sir.

18     Q.   Did you ever observe the defendant to

19  use those pills to, for example, treat his

20  congestion?

21     A.   No, sir.

22     Q.   Now, you also indicated purchasing pills

23  at the same time as Jessica Patterson.  Did

24  Jessica Patterson also provide you and the

25  defendant with pseudoephedrine pills?

1     A.   Yes, sir.

2     Q.   For her or other persons, what was the

3  reason they would provide you with the

4  pseudoephedrine pills?

5     A.   We would give them methamphetamine back.

6     Q.   Now, did Jessica Patterson know how to

7  manufacture methamphetamine?

8     A.   Yes, but she didn't do it.

9     Q.   So she relied on you and the defendant

10 to manufacture the methamphetamine to support her

11 habit?

12     A.   Right.

13     Q.   Besides Jessica Patterson, do you know

14 the name Pierson Lazarov?

15     A.   Yes, sir.

16     Q.   And what, if anything, did Pierson

17 Lazarov do to assist you and the defendant with

18 manufacturing methamphetamine?

19     A.   He supplied pills.

20     Q.   And what would he receive in return?

21     A.   I think he got a quarter round of dope

22 for each box.

23     Q.   And when you say dope, that's

24 methamphetamine?

25     A.   Yes, sir.

1      Q.    Do you know a person by the name of Ted

2  Cook?

3      A.    Yes, sir.

4      Q.    And how do you know Ted Cook?

5      A.    I've known him for years, kind of like

6  in a drug way.

7      Q.    When you say in a drug way, was he

8  involved in the manufacture of methamphetamine?

9      A.    He bought boxes from time to time, but

10  that's it.

11      Q.    Bought boxes of pseudoephedrine pills?

12      A.    Yes, sir.

13      Q.    And would he provide those to you and

14  the defendant for the manufacture of

15  methamphetamine?

16      A.    Yes, sir.

17      Q.    Okay, and I think you indicated, but

18  approximately how much -- how many boxes of

19  pseudoephedrine were you using per cook?

20      A.    Between five to ten, depending on how

21  many we got.  Sometimes we might only have six or

22  eight, depending on who bought pills when and

23  where and, you know, the availability of car

24  rides to get there.

25      Q.    Now, I don't want to put words in your

1    mouth, but you indicated you cooked at least 20

2    times.  So would it be fair to say in the times

3    you've cooked with the defendant you've used over

4    a hundred boxes of pseudoephedrine pills?

5        A.    I don't know about -- yes, it would have

6    to be, yes.

7        Q.    Now, let's talk about some of the other

8    materials.  You indicated that you would use

9    anhydrous ammonia to manufacture the

10   methamphetamine?

11       A.    Yes.

12       Q.    And would you tell us how it was that

13   you and the defendant obtained the anhydrous

14   ammonia.

15       A.    Normally, Mr. Quinlan would pull up to

16   an anhydrous plant, like the railroad tracks, and

17   I would jump out and run to the tank and hook up

18   my hose to a gas can, open the valve, get the

19   anhydrous out, run back to the car, and we'd take

20   off.

21       Q.    And did you do that on -- approximately

22   how many times did you steal anhydrous ammonia in

23   that fashion?

24       A.    At least 20 or more.

25       Q.    And where were some of the locations

1  that you would steal anhydrous ammonia with the

2  defendant?

3      A.   Stockland, let's see -- Stockland,

4  Fountain Creek, and that's just about it, I

5  believe.

6      Q.   Now, what type of -- I think you've

7  testified to this, but what type of container did

8  you put the anhydrous into?

9      A.   If we were storing it or --

10     Q.   When you were first using it.

11     A.   When we first got it, we would put it

12  into, like, a -- it would be in a -- what we

13  called a pop bottle ring, which was a milk

14  container with pop bottles -- made a funnel out

15  of pop bottles and taped to it, we used that, or

16  sometimes we would use a hose into a gas can.

17     Q.   Now, the anhydrous ammonia, you're aware

18  it is a toxic substance?

19     A.   Yes, sir.

20     Q.   And how was it that you were able to

21  transport the anhydrous in the vehicle?

22     A.   Depending on the container we had it in,

23  if we had it in this gas can, you put the lid on

24  with a hose that goes out the window and make

25  sure it's all shut up, and it will suck the smell

1    out.  If it's in the pop bottle, you just stick

2    the end out and it will suck the smell out, kind

3    of like a vacuum.

4        Q.    And after you would -- let me ask about

5    the other materials you talked about.  How would

6    you obtain the other materials besides the

7    anhydrous and the pills that were used to

8    manufacture methamphetamine?

9        A.    Just go around and buy them.

10        Q.    Now, where was it that you and the

11    defendant manufactured methamphetamine?

12        A.    A lot of places.  Schleif Bridge, off

13    railroad tracks, railroad cars, under a couple

14    bridges out by Stockland.  Just country roads.

15        Q.    Why was it you manufactured the

16    methamphetamine in these locations?

17        A.    Nobody around.

18        Q.    When you would manufacture the

19    methamphetamine, what would you do with the

20    by-products that came out from the

21    methamphetamine?

22        A.    Usually burned them.

23        Q.    Now, what -- once you produced the

24    methamphetamine, what did you do with the

25    methamphetamine?

1    A.   Well, we would dry it out and usually

2  start smoking on it or using it right then and

3  there.  Most of it was personal use, but we sold

4  some here and there.

5    Q.   And did you -- you had to provide some

6  to the people who provided you with the

7  pseudoephedrine pills?

8    A.   Correct.

9    Q.   And how was it that it was decided how

10  much methamphetamine an individual who provided

11  you with pills received?

12    A.   Each box pretty much got a quarter gram

13  of methamphetamine for each box, or you got $20

14  cash.  If we paid for it, like if I gave you the

15  money and you went and paid for it with my money,

16  we'd give you $20 cash, and if you paid for it

17  with your money we paid you 25.

18    Q.   Was the defendant involved in

19  distributing the methamphetamine?

20    A.   Yes.

21    Q.   And was he involved in making the

22  decisions of how much methamphetamine a person

23  might receive?

24    A.   Yes.

25    Q.   And again, just to go over, you

1  indicated you manufactured at least 20 times,

2  methamphetamine, and how much methamphetamine --

3  I know you said this -- how much methamphetamine

4  per cook did you typically produce?

5      A.   Between five to ten, on average.

6  Sometimes more, times less.

7          MR. MILLER:  I have no further

8  questions, Your Honor.

9          THE COURT:  Mr. Taylor.

10          MR. TAYLOR:  Very briefly, Your Honor.

11                  CROSS-EXAMINATION

12  BY MR. TAYLOR:

13      Q.   Mr. Caswell?

14      A.   Sir.

15      Q.   I think you and I have been in this

16  courtroom before with Jessica, right?

17      A.   No.

18      Q.   You were never in here with me and

19  Jessica?

20      A.   No, sir.

21      Q.   Well, I've mistaken you for somebody

22  else.  I apologize.

23          The records we have that Mr. Miller, I

24  believe, referred as to the purchases that were

25  made seemed to stretch, and you correct me if I'm

30

1   wrong, from about January 27 of 2006 through

2   about April of 2007.  Is that also your

3   estimation about the period of time during which

4   you and Mr. Quinlan may have been manufacturing

5   methamphetamine?

6        A.   I never started manufacturing until I

7   got off house arrest.

8        Q.   And when would that have been?

9        A.   March 2005 -- or, no, 2006.

10       Q.   2006?  Okay.  So you would have started

11   in March of 2006, and then when would your

12   involvement have ended?

13       A.   Around mid-June.

14       Q.   Of?

15       A.   2006.

16            THE COURT:  Let me ask, is that because

17   you needed money or because the addiction and

18   attraction to meth was so great that you went

19   right back?

20            THE WITNESS:  I'm sorry?

21            THE COURT:  Well, I'm trying to figure

22   out, you said right after house arrest.  So were

23   you using meth while you were on house arrest?

24            THE WITNESS:  From time to time.

25            THE COURT:  Okay.  So did you ever, in

1   the whole legal process, get off meth?

2          THE WITNESS:  Get off meth?

3          THE COURT:  Yeah, get clean.

4          THE WITNESS:  Right before

5   incarceration, actually, just for a little bit of

6   time.  But other than that I went back, yes,

7   because of my habit.

8          THE COURT:  Was it the habit more than

9   the money?

10         THE WITNESS:  Yes.  I was working

11  construction at the time.

12         THE COURT:  Okay.  Thank you.

13  BY MR. TAYLOR:

14      Q.   Just to catch that date, Mr. Caswell, I

15  think about March '06 is when you became

16  involved; is that right?

17      A.   Yes, sir.

18      Q.   And about when did your involvement end?

19      A.   Mid-June.

20      Q.   Of '06?

21      A.   Yes.

22      Q.   To your knowledge, and you correct me if

23  I'm wrong, your knowledge of that meth that Mr.

24  Quinlan would have been involved in, either

25  manufacturing, distributing, would that have been

1  limited to that period of time of March 2006 to

2  June of 2006?

3      A.   Except for the boxes that I bought from

4  him in February.

5      Q.   Of?

6      A.   Pretty much.

7      Q.   Of what year.

8      A.   February of 2006.  I bought two, I

9  believe, at Wal-Mart.

10      Q.   Now, I see that various individuals,

11  let's -- let's then concentrate just on that

12  period between March of 2006 and June of 2006,

13  just about a three-month period, right?

14      A.   Yes.

15      Q.   My math's not great, but six minus three

16  I think I can do.  During that period, of the

17  number of people you referred to, Mr. Cook and

18  others, Ms. Patterson, how many times were you

19  personally involved in sending someone out, like

20  Jessica or Ted Cook, to purchase pseudoephedrine

21  pills?

22      A.   How many times personally?  I couldn't

23  honestly say.

24      Q.   Okay.  Were there times during that

25  period where you would tell people to go purchase

1   pseudoephedrine yourself?

2       A.   Yes.

3       Q.   Were there times when both you and Mr.

4   Quinlan together would instruct people to go out

5   and buy pseudoephedrine pills?

6       A.   Yes.

7       Q.   And I take it the people you would send

8   out were known to both you and Mr. Quinlan,

9   correct?

10      A.   Yes.

11           MR. TAYLOR:  Thank you, Mr. Caswell.

12           THE COURT:  Mr. Miller.

13                     REDIRECT EXAMINATION

14  BY MR. MILLER:

15      Q.   I do have just one follow-up.  Was there

16  a time during your relationship with the

17  defendant when, to your knowledge, he was unable

18  to go purchase pseudoephedrine pills?

19      A.   I believe it was when he lost his

20  license, sir.  He got a ticket somewhere, I think

21  in Champaign or something, and he couldn't

22  purchase it then.

23      Q.   So you required other people to be able

24  to purchase pills?

25      A.   Yes, sir.

34

1          MR. MILLER:  I have no further

2    questions, Your Honor.

3          THE COURT:  Mr. Taylor, follow-up?

4          MR. TAYLOR:  No, thank you, Your Honor.

5          THE COURT:  You may take Mr. Caswell

6    back into custody.

7          Call the next witness.

8          MR. MILLER:  Your Honor, we would call

9    Ken Massey.

10                    KEN MASSEY,

11   called as a witness, after having been first duly

12   sworn, was examined and testified as follows:

13                 DIRECT EXAMINATION

14   BY MR. MILLER:

15     Q.   Would you please tell us your name and

16   spell your last name for the court reporter?

17     A.   Ken Massey, M-a-s-s-e-y.

18     Q.   And you're currently employed by the

19   Illinois State Police?

20     A.   Correct.

21     Q.   You're currently assigned to the Joint

22   Terrorism Task Force here in Champaign?

23     A.   Yes.

24     Q.   Turning your attention to before that

25   assignment, in 2005 and 2006 and, I think

1   extending, into 2007, where were you assigned?

2       A.   I was assigned to Zone 3 Methamphetamine

3   Response Team with the Illinois State Police.

4       Q.   And where's Zone 3 located?

5       A.   It encompasses Ford, Iroquois, and

6   Kankakee Counties.

7       Q.   And as part of that assignment, you

8   received training in the investigation of

9   methamphetamine manufacturing?

10      A.   Yes, I have.

11      Q.   And are you aware, again as part of your

12  duties, of a change in Illinois law that

13  restricted -- recently restricted the sale of

14  pseudoephedrine?

15      A.   Yes.

16      Q.   And could you just briefly summarize for

17  us how it is that the sale of pseudoephedrine was

18  restricted.

19      A.   In Illinois, I believe it was January --

20  after January 15th of 2006, that they had to

21  display the product behind the counter so they

22  weren't readily accessible to the public.  Also,

23  under Illinois law, it required -- pseudoephedrine

24  law -- documenting the purchase of

25  pseudoephedrine, how much was being sold, who it

1    was sold by, and it was regulated that the person

2    had to show a valid government identification,

3    photo identification, to make the purchase as

4    well.

5            Most stores had a store policy limiting

6    purchase to one box, and that was not law.  The

7    Illinois law restricted -- you could only legally

8    purchase 7,500 milligrams of pseudoephedrine in a

9    30-day period, and the federal statute was

10   similar.  You could purchase no more than 9,000

11   milligrams in a 30-day period, and I believe

12   there was a per day purchase restriction of at

13   least 3.6 milligrams.

14       Q.   And following that law change were you

15   then able to review pseudoephedrine laws that

16   were maintained by stores that sold

17   pseudoephedrine to determine purchases that were

18   made?

19       A.   Yes.

20       Q.   And I think, as you indicated, that

21   would have began sometime around January 15th,

22   2006?

23       A.   Yes.

24       Q.   So in this case did you, in fact,

25   provide to the Government, which was provided to

1    the Probation Officer, record of pseudoephedrine

2    law purchases from about January 27th, 2006, to

3    April of 2007?

4        A.   Yes, sir, we did.

5        Q.   Just to be clear, those purchases

6    started around January 27th, 2006, those records

7    were only maintained beginning around January

8    15th?

9        A.   Correct.

10        Q.   So there could have been purchases

11    before then, there simply would have been no logs

12    that were maintained?

13        A.   That's correct.

14        Q.   Also, to be clear, these logs are

15    maintained by the individual stores?

16        A.   Yes.

17        Q.   So for you to go out and find these

18    logs, you have to personally go to stores or

19    contact stores to review the logs that they have

20    maintained.

21        A.   That's correct.

22        Q.   Let me ask you about the investigation

23    involving the defendant, Robert Michael Quinlan,

24    and Dan Caswell and Jessica Patterson.  Were you

25    personally involved in that?

1      A.    Yes, I was.

2      Q.    And through that investigation did you

3  obtain, in fact, 58 pseudoephedrine logs that are

4  reflected in the presentence report in this case?

5      A.    Yes, we did.

6      Q.    And just, again, to lay the foundation

7  for this, is the information that you provided to

8  Probation supported by the pseudoephedrine logs

9  that you found in this case?

10      A.    Yes.

11      Q.    And as part of your investigation did

12  you also interview the persons who had made these

13  pseudoephedrine purchases?

14      A.    With the exception of Ted Cook, the logs

15  that were included in the file that you're

16  referring, everyone else was interviewed.

17      Q.    And let me first -- the first person

18  listed here is Jessica Patterson.  Did you

19  interview Jessica Patterson regarding her

20  purchases of pseudoephedrine?

21      A.    Yes.

22      Q.    And did she acknowledge to you who she

23  provided the pseudoephedrine pills to?

24      A.    Yes.

25      Q.    And who did she say they were provided

1  to?

2      A.    Mr. Caswell and Mr. Quinlan.

3      Q.    And what was the purpose that she

4  provided those pills?

5      A.    For them to manufacture methamphetamine.

6      Q.    In fact, she admitted that she has an

7  addiction to methamphetamine?

8      A.    Yes.

9      Q.    And then going forward, we've already

10  heard Mr. Caswell testify, did you also interview

11  Pierson Lazaroff?

12      A.    Yes, we did.

13      Q.    And did he acknowledge making the

14  purchases of pseudoephedrine that were reflected

15  in the logs?

16          THE COURT:  What was the name; how do

17  you spell that?

18          MR. MILLER:  Pierson, P-i-e-r-s-o-n,

19  Lazarov, l-a, z as in zebra, r-o, v as in Victor.

20      Q.    And did he indicate what he did with the

21  pseudoephedrine that he purchased?

22      A.    I don't remember whether he gave it to

23  Mr. Caswell or Mr. Quinlan.  He did also tell me

24  that he had been to Mr. Quinlan's house in the

25  past and received methamphetamine, but those

1  particular pills, I don't remember who he said he

2  gave them to.

3      Q.    It was obviously either Mr. Caswell or

4  Mr. Quinlan?

5      A.    That's my recollection.

6      Q.    There's also listed a Joseph Hart.  Did

7  you interview Joseph Hart?

8      A.    Yes.

9      Q.    And did he acknowledge making the

10 pseudoephedrine purchases reflected in the logs?

11     A.    Yes, he did.

12     Q.    And what he indicate that he did with

13 the pills?

14     A.    Gave them to Jessica Patterson.

15     Q.    And did he indicate that, in fact, he

16 had been -- why was it that he gave those pills

17 to Jessica Patterson?

18     A.    She -- she had basically recruited him

19 to purchase pseudoephedrine toward the

20 manufacture of methamphetamine, and he had

21 indicated that he was promised a certain amount

22 of methamphetamine per box of pills and/or money

23 in exchange for pseudoephedrine pills.

24     Q.    And then Ms. Patterson, I think you

25 already said, provided the pseudoephedrine pills

1  to Mr. Caswell and Mr. Quinlan?

2    A.   Yes.

3    Q.   Timmy Deaton was listed here.  Did you

4  speak to him?

5    A.   Yes.

6    Q.   Did he knowledge making the

7  pseudoephedrine purchases reflected in the logs?

8    A.   Yes.  He also told us that he made other

9  purchases which we could not find, but we did

10  find documented purchases that he had made.

11    Q.   And what did he indicate he did with the

12  pseudoephedrine?

13    A.   Mr. Deaton is Mr. Hart's stepbrother or

14  half brother; I can't recall which.  Basically,

15  they were approached together, and they gave the

16  pills to Jessica Patterson.

17    Q.   And Paula Espinoza, did you interview

18  her during this investigation?

19    A.   Yes.

20    Q.   And she also acknowledged making the

21  purchases reflected in the logs?

22    A.   Yes, she did.

23    Q.   And what did she indicate that she did

24  with the pseudoephedrine she purchased?

25    A.   She gave the pills to Jessica.  Jessica

1  is her cousin.

2      Q.   And, again, Jessica has acknowledged

3  then forwarding those pills on to the defendant

4  and to Mr. Caswell?

5      A.   Yes.

6      Q.   Did you also speak to Christopher

7  Hollis?

8      A.   Yes.

9      Q.   Did he acknowledge making the purchases

10 reflected in the pseudoephedrine logs?

11     A.   Yes.

12     Q.   What did he indicate he did with the

13 pills that he purchased?

14     A.   Gave them to Jessica Patterson.

15     Q.   Lequita, L-e-q-u-i-t-a, Richards, did

16 you interview her as well?

17     A.   Yes.

18     Q.   And did she acknowledge making the

19 purchases of pseudoephedrine reflected on the

20 logs?

21     A.   Yes.

22     Q.   What did she indicate she did with the

23 pills?

24     A.   Gave the pills to Jessica Patterson.

25     Q.   Amy Pentecost, did you interview her?

1     A.   I didn't personally interview Amy.  She

2  was interviewed by other agents in our group.

3     Q.   Did she acknowledge making the purchases

4  of pseudoephedrine reflected in the logs?

5     A.   Yes, she did.

6     Q.   And did she state what she did with the

7  pseudoephedrine pills?

8     A.   To be honest, I don't recall.  I know

9  there was a close association between her and Mr.

10  Quinlan.  I don't recall specifically, since I

11  didn't do the interview and it's been awhile

12  since I read the reports, but I don't

13  specifically know who she gave the pills to.

14     Q.   Did you interview Jamie Williams?

15     A.   Yes.

16     Q.   And did Jamie acknowledge making the

17  purchases reflected in the pseudoephedrine logs?

18     A.   Yes, she did.

19     Q.   What did she indicate she had done with

20  the pseudoephedrine?

21     A.   She gave the pseudoephedrine pills to

22  Jessica Patterson.

23     Q.   Now, in these logs, are you aware there

24  was a period of time from --

25          THE COURT:  Did he say anything about

44

1    Theodore Cook?

2          MR. MILLER:  He did not.  Mr. Caswell

3    testified regarding Theodore Cook.

4       Q.    I guess I'll ask, did you interview

5    Theodore Cook as part of your investigation?

6       A.    No, I believe we just never got around

7    to interviewing him.

8          THE COURT:  How about Pierson Lazarov,

9    Joseph Hart, Timothy Deaton, D-e-a-t-o-n?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  And Paula Espinoza?

12          THE WITNESS:  Yes, sir.

13          THE COURT:  I don't know if he's seen

14    this list.

15          MR. MILLER:  Actually, this came from

16    his information, Your Honor.  He did testify --

17          THE COURT:  I just wondered how many

18    people on this list he did not talk to.

19          MR. MILLER:  From going through the

20    interview, I believe the only people on the list

21    would be, besides the defendant, who's listed on

22    the list, would be Theodore Cook, and then, of

23    course, as he testified, Amy Pentecost was

24    interviewed by another agent, not by him

25    personally, but I believe all the other persons

1    he's indicated he interviewed.

2        Q.    And I do want to just clear up one thing

3    in the log, several things when we reviewed this

4    log, there was a Christopher Hart listed, is it

5    actually correct to say those are, all the

6    purchases, by Joseph Hart, not Christopher Hart?

7        A.    Yes.

8        Q.    And those are reflected in the

9    pseudoephedrine logs?

10       A.    Yes.

11       Q.    Now, in reviewing the pseudoephedrine

12   log, there is a period of time from approximately

13   April of 2006 until July 28, 2006, that the

14   defendant himself did not make any purchases, as

15   reflected in the pseudoephedrine logs?

16       A.    That's correct.

17       Q.    And you indicated before that you need

18   some form of identification to purchase

19   pseudoephedrine?

20       A.    Yes.

21       Q.    Have you determined that, in fact,

22   during much of that time period the defendant was

23   without his driver's license?

24       A.    Yes.  I believe it was May 19th he was

25   stopped on Interstate 57 by Illinois State Police

1   Trooper Mark Holly for speeding in excess of 40

2   miles over the posted limit.  He posted his

3   Illinois driver's license as bond and he

4   exchanged $200 cash, I believe it was, for his

5   driver's license on July 28th, I believe it was,

6   when he got his license back.

7        Q.   Would that have been in Urbana,

8   Illinois?

9        A.   Yes.

10       Q.   And then did you find a log that

11  indicated that, in fact, later that same day at

12  3:19 p.m. he purchased a box of pseudoephedrine,

13  I guess it would have been 2.4 grams of

14  pseudoephedrine, filled at the Walgreen pharmacy

15  in Urbana, Illinois?

16       A.   Yes, sir.

17       Q.   Now, after Mr. Caswell and Ms. Patterson

18  were arrested, it appears the logs reflect

19  purchases by the defendant himself and Charity

20  Hickerson?

21       A.   Yes.

22       Q.   Have you interviewed Charity Hickerson

23  as part of your investigation?

24       A.   Yes.

25       Q.   And has she acknowledged making the

47

1    purchases of pseudoephedrine reflected in the

2    logs?

3        A.    To some extent.  We arrested her, and

4    she began talking to us and then decided she

5    didn't want to speak to us anymore.  She got an

6    attorney, and he notified us, I believe it was on

7    two additional occasions, that she wanted to

8    cooperate and speak with us, then she would

9    revoke her intention.  We did also interview her

10   boyfriend.  Her boyfriend told us that she had

11   admitted to him she had purchased four or five

12   boxes of pseudoephedrine for Mr. Quinlan to make

13   methamphetamine with.

14       Q.    Now, just to establish, do you have

15   other information regarding the connection

16   between Charity Hickerson and the defendant?

17       A.    Yes.

18       Q.    In fact, did you recover a

19   methamphetamine lab that later you found to have

20   a fingerprint of the defendant on it in a

21   location where Charity Hickerson had driven the

22   defendant?

23       A.    Yes.

24       Q.    And that was pretty convoluted, what I

25   just said, so would you just explain to the Court

1  the circumstances by which Ms. Hickerson was

2  connected with Mr. Quinlan and that

3  methamphetamine lab.

4      A.    I believe it was November 14th of 2006

5  we were doing surveillance on Mr. Quinlan's

6  house.  At that time Charity Hickerson was at his

7  house; we observed her at the residence.  We

8  observed Mr. Quinlan drive away from the

9  residence, go out east of Milford.  They turned

10  south, I believe it was, on 2720 East Road; it's

11  Sugar Creek Bridge.  I think the locals call it

12  Schleif Creek Bridge.  I think that's the same

13  bridge Mr. Caswell --

14      Q.    Would you know how to spell that?

15      A.    I believe it's S-c-h-l-e-i-f, but the

16  actual name of the bridge is Sugar Creek Bridge.

17  There is a bronze plaque on it.  They drove to

18  the bridge.  We broke off contact with them

19  because it was rural and it was night and we

20  didn't want to give away our position.  We went

21  back to Mr. Quinlan's residence; they returned in

22  the meantime.

23          Continuing surveillance, they took the

24  same route out in the country again, stopped at

25  the bridge.  Evidently, Mr. Quinlan exited the

49

1   vehicle.  Charity Hickerson continued south on

2   the road, realized that we were following, pulled

3   into a residence.  My partner, Trooper Chris

4   Kerner, was aware that Ms. Hickerson's driver

5   privileges were suspend.  We effected a traffic

6   stop, ultimately arrested her.  She admitted that

7   she had dropped Mr. Quinlan off at the bridge.

8            After incarcerating her, Trooper Kerner

9   and I went back out to search for the meth lab,

10  found it under Sugar Creek Bridge.  As you had

11  mentioned, there was one of Mr. Quinlan's

12  fingerprints on some electrical tape that was

13  used in the anhydrous rig that Mr. Caswell had

14  described before, a milk jug and two two-liter

15  bottles taped together.

16      Q.    And then just to further highlight the

17  connection, did your pseudoephedrine logs

18  indicated that at 4:15 p.m. on November 6, 2006,

19  Charity Hickerson had bought pseudoephedrine

20  pills at the CVS pharmacy in Kentland, Indiana?

21      A.    Yes.

22      Q.    Did those logs also indicate 15 minutes

23  later at that very same location the defendant,

24  Robert Quinlan, also bought a box of

25  pseudoephedrine?

50

1      A.    That's correct.

2            MR. MILLER:  I have no further

3  questions.

4            THE COURT:  Mr. Taylor?

5            MR. TAYLOR:  No, Your Honor.

6            THE COURT:  You're complete, Mr.

7  Miller?

8            MR. MILLER:  Yes, Your Honor.

9            THE COURT:  You may step down.  You're

10  free to go.

11            The Government has rested, right?

12            MR. MILLER:  Yes, Your Honor.

13            THE COURT:  Mr. Taylor.

14            MR. TAYLOR:  Your Honor, my client has

15  decided not to testify.  We'd rest.  Thank you.

16            THE COURT:  Argument, Mr. Taylor?  It's

17  your motion so you argue first.

18            MR. TAYLOR:  Your Honor, I just want to

19  note one number, which will take me just five

20  seconds.

21            THE COURT:  Let me ask, Mr. Quinlan, the

22  decision not to testify, that's your personal

23  decision?  You weren't forced to do that?

24            THE WITNESS:  I was not forced.

25            THE COURT:  Or threatened?  You made

1  that choice?  Okay.  Mr. Taylor, whenever you've

2  ready.

3          MR. TAYLOR:  Your Honor, I'm going to

4  make this calculation very simple.

5          THE COURT:  What is it, one gram?

6          MR. TAYLOR:  One gram pseudoephedrine --

7          THE COURT:  Right.

8          MR. TAYLOR:  Equals ten kilos.

9          THE COURT:  Right.  And they calculate

10  151.1, which is -- comes out to --

11          MR. TAYLOR:  That comes out, Your Honor,

12  to 1,512 kilograms of marijuana.

13          THE COURT:  Now, my question, Ms. Brown,

14  is that gets us to -- what did you have, 32?

15          MS. BROWN:  Yes, Your Honor.

16          THE COURT:  32 offense level.  What if

17  it was 1,400?

18          MS. BROWN:  I'll have to calculate it,

19  Your Honor.  It'll take --

20          THE COURT:  What I want to know is, Mr.

21  Taylor, I know, is going to make some argument

22  about proportionality or numbers.  He's not going

23  to say no, Judge, it's zero.  He's not going to

24  do that.  So I'm just wondering when it becomes

25  relevant to the Court's calculation as the

1  numbers.

2          MR. TAYLOR:  Your Honor, may I?

3          THE COURT:  Yes.

4          MR. TAYLOR:  I think I've already done

5  that.  I tried.

6          THE COURT:  Okay, and then we'll have

7  Ms. Brown confirm it.

8          MR. TAYLOR:  I tried to make this just

9  as simple as possible, Your Honor.  Ms. Brown

10  indicated a number level of 32.  As you remember

11  the chart, Your Honor, and the PSR which showed

12  all purchases?

13          THE COURT:  Yes.

14          MR. TAYLOR:  That showed 151.2 grams of

15  pseudoephedrine.

16          THE COURT:  Right.

17          MR. TAYLOR:  And that ended up with

18  1,512 kilograms of marijuana.  That, Your Honor,

19  is a 32.  Are we together, Your Honor?

20          THE COURT:  Right.

21          MR. TAYLOR:  Now we go to Taylor's

22  argument.  Taylor argues that between March 6 and

23  6/06 is a period of time which we have what looks

24  like pretty reliable information from Mr. Caswell

25  of his knowledge of my client's doings.  I have

53

1   gone to that table, Your Honor, and I have

2   absented therefrom any purchases before March

3    '06, any purchases after 6/06.  I come up with,

4   Your Honor, 70 grams of pseudoephedrine times

5   ten, 700 kilograms.  And Ms. Brown will correct

6   me, I believe that is a level 28.

7           MS. BROWN:  That's level 30.

8           MR. TAYLOR:  Thank you, Ms. Brown.  My

9   error, Your Honor.

10          THE COURT:  Thank you.  When does it

11  become 31 and 32, Ms. Brown?

12          MS. BROWN:  I'm sorry, Your Honor?

13          THE COURT:  When does it go from 30, 31,

14  32.

15          MS. BROWN:  Level 30 is 700 kilograms,

16  31 a thousand kilograms, level 32 is a thousand

17  kilograms but less than 3,000 kilograms of

18  marijuana.

19          THE COURT:  Okay, what was the last one?

20          MS. BROWN:  1,000 to 3,000.

21          THE COURT:  1,000 to 3,000.  So, really,

22  the key number here between 30 and 32 is a

23  thousand.  Thank you.  That's what I was looking

24  for.

25          MR. TAYLOR:  Thank you, Your Honor.

1   Again, Your Honor, I'm arguing offense conduct of

2   30, which is two levels higher than is

3   Ms. Brown --

4           THE COURT:  And what is the theory that

5   it's only 700?

6           MR. TAYLOR:  I'm arguing, Your Honor,

7   regarding relevant conduct that we have to stop

8   someplace.  You have great discretion now, Your

9   Honor, as to relevant conduct after Goll and

10  Kimbrough.

11          THE COURT:  Right, but I can't just make

12  it up.

13          MR. TAYLOR:  That's why I'm giving you a

14  number, Judge.

15          THE COURT:  Yeah, but I want to know how

16  you're pulling the number out of the air.

17          MR. TAYLOR:  Your Honor, what I did

18  was --

19          THE COURT:  So what I'm trying to figure

20  out, what's the significance of March 6 to June

21  6,'06, and why we would not look before and

22  after.

23          MR. TAYLOR:  And, Your Honor, I

24  apologize, I didn't mention this earlier, we have

25  had one live witness today, Mr. Caswell, and I

1  find no reason to find him not credible.

2           THE COURT:  Mr. Massey wasn't live?

3           MR. TAYLOR:  Mr. Massey still has a

4  pulse.  In no way do I mean to demean

5  Investigator Massey's testimony.  He and I have

6  worked together in the past, he is a sterling

7  officer, but he is repeating what others told

8  him.  And what I'm saying, Your Honor, is

9  Mr. Caswell tells us he was involved from March

10  2006 to June 2006, and, Your Honor, I believe

11  that's the most reliable testimony as to relevant

12  conduct.  He was here.  He was at the

13  manufacturer.  He was at the purchase.  He

14  purchased, he told people to purchase.

15           THE COURT:  So you mean I can't look at

16  Jessica Patterson's June 7th because she is not

17  here?

18           MR. TAYLOR:  I'm not saying that,

19  Judge.

20           THE COURT:  Okay.

21           MR. TAYLOR:  I'm not.  I'm just trying

22  to give the Court something to hang its hat on,

23  rather than pulling something out of the air.

24  That's where I'm going, Judge.

25           THE COURT:  Well, I'm just trying to

1    figure out who I discount, who I find isn't

2    credible, who I discount or who I leave out to

3    get under a thousand, which is a big jump from

4    fifteen hundred and twelve to nine hundred and

5    ninety-nine.

6            MR. TAYLOR:  Your Honor, I think it's a

7    simple matter.  It's not that you discount

8    anyone, it's you find Mr. Caswell --

9            THE COURT:  I have to count Caswell.

10           MR. TAYLOR:  -- is the most reliable

11   source of authority for the relevant conduct in

12   which my client was involved.  That in no way,

13   Your Honor, diminishes Investigator Massey, and

14   it really doesn't diminish, Your Honor, anyone

15   else because --

16           THE COURT:  Well, we talked to Mr.

17   Quinlan.  We got Mr. Quinlan here.

18           MR. TAYLOR:  I'm not putting him on the

19   stand, Your Honor.

20           THE COURT:  No, but I'm saying -- Mr.

21   Miller, where did Mr. Quinlan's number come from?

22           MR. MILLER:  Your Honor, these are all

23   pseudoephedrine logs that were maintained by the

24   stores where the purchases were made by a person

25   who exhibited ID and signed for those.  So these

1  are actual purchases of pseudoephedrine that were

2  made by the individuals indicated, including Mr.

3  Quinlan.

4          THE COURT:  Okay.  Do you agree with

5  that, Mr. Taylor?

6          MR. TAYLOR:  I do, Your Honor.  Your

7  Honor, I didn't do a good enough job of

8  explaining initially where I was going.

9          THE COURT:  Right.  Well, it's easy.  I

10  can get lost late in the afternoon.

11          MR. TAYLOR:  I was hoping you wouldn't

12  agree with me when I said that, Your Honor.  Ms.

13  Brown, I think conservatively, looked only at

14  those logs, Your Honor, of pseudoephedrine pills

15  that were purchased that were verified.  I've

16  seen the logs, Judge.  They're bona fide.  She

17  didn't go into statements by Caswell or Quinlan

18  or Patterson, et cetera.  She said these are the

19  logs, this is the pseudoephedrine which is

20  provable.

21          She then took the sum of that, Your

22  Honor, 151.2 grams.  She then converted it into

23  marijuana, 1,512 kilograms of weed, and that

24  gives you, Your Honor, your 32.  That's the whole

25  basis of my argument, Your Honor.  Relevant

1   conduct, as Your Honor knows more than me, is a

2   dangerous concept in sentencing.

3           THE COURT:  Well, it is if somebody says

4   all these dates and times and there's nothing to

5   prove it other than accepting their testimony,

6   but here Mr. Miller is saying someone had to

7   produce an ID, Mr. Miller?

8           MR. MILLER:  Yes, Your Honor.

9           THE COURT:  That was the testimony, and

10  somebody had to sign for it.  And, Ms. Brown, all

11  you did was take those logs from these various

12  pharmacies, right?

13          MS. BROWN:  Yes, Your Honor, and the

14  rest of the reports I got from the Government.

15          THE COURT:  So, you see, that's -- I

16  guess my problem here is this is from business

17  records, not from Mr. Caswell.

18          MR. TAYLOR:  But Mr. Caswell did say

19  that he was involved in those business

20  transactions between March of 2006 and June of

21  2006.  It can't just be a record, Your Honor, it

22  has to be a warm, beating heart.  And he's the

23  only one I've seen -- well, I shouldn't use that

24  analogy, Your Honor.

25          THE COURT:  So is it your position that

1  all of these people needed to be called and

2  because the Government didn't call them their

3  evidence fails.

4           MR. TAYLOR:  No, Your Honor.  In fact, I

5  told Mr. Miller I would be happy to stipulate to

6  a discovery today and have us decide it on that.

7  I'm not saying that at all, Your Honor.  I'm

8  saying relevant conduct, even if we look at the

9  specificity that the 7th Circuit tells Your

10  Honor, is an incredibly amorphous concept.  I'm

11  trying to keep this very simple, Your Honor.  I

12  realize my argument gains no purchase with this

13  Court but --

14           THE COURT:  I feel like I'm looking at

15  that wall, but maybe I don't understand, looking

16  for where the hand -- the hand and feet should go

17  so I can climb up your wall and figure it out,

18  but I just don't see what I can grab ahold.

19           MR. TAYLOR:  And, Your Honor, I

20  understand the Court's dilemma.  May I proceed,

21  Your Honor?

22           THE COURT:  Yes.

23           MR. TAYLOR:  So we start at an offense

24  level of 30.  Now, Ms. Brown, and certainly she

25  had reason to do this, we disagree and at least

1  like to make the argument, Your Honor, has not

2  given my client the two points for acceptance of

3  responsibility; therefore, you can't get the one

4  point for preparation of litigation.  So she

5  hasn't given us the three, I've given us the

6  three, Your Honor, which takes us down to 27.

7           I'm going to try to go pretty slowly on

8  this, Your Honor, although I think in the end

9  it's not going to matter.  But, anyway, that

10  takes us down to 27.  We agree that two points

11  should be added for hazardous substance, Your

12  Honor.  That takes us to 29.  Ms. Brown also

13  gives us the two points for hazardous waste.  She

14  gives us four points, Your Honor, for --

15           THE COURT:  Why does he lose acceptance?

16           MR. TAYLOR:  It's my understanding, and

17  I don't want to make -- and I know Probation

18  never argues for a position, Your Honor, they

19  state a position to the Court.  If we look at

20  page 11, Your Honor?

21           THE COURT:  Yeah, I see 30 -- paragraph

22  32.

23           MR. TAYLOR:  Yeah, we're zero there,

24  Judge.

25           THE COURT:  Right.

1          MS. BROWN:  Your Honor, if I may, also

2    in paragraphs 17, 18, 19 it talks about

3    acceptance of responsibility.

4          THE COURT:  Well, why don't we just have

5    all these people go to trial, then, if they're

6    not going to get acceptance of responsibility?

7    It looks to me like, every time I turn around,

8    nobody's getting acceptance of responsibility.

9          MR. MILLER:  Your Honor, we were ready

10   for trial in this case and we had prepared, and

11   at the -- what we would call the eleventh hour

12   Mr. Quinlan decided to enter a plea of guilty,

13   which he did.

14         THE COURT:  So it's really paragraph 17

15   is the key here.

16         MR. MILLER:  And I don't know if the

17   Court requires plea colloquy, but we were

18   concerned because during the plea colloquy the

19   Court almost didn't take the plea because he

20   stated that much of the pseudoephedrine was for

21   congestion, and the Court even well, you have to

22   plead guilty to something.

23         Our position has been consistent here,

24   if you'll accept what you did, that's acceptance

25   of responsibility.  He has not admitted to any of

1   the relevant conduct or anything beyond the bare

2   bones of the change of guilty plea, and that's

3   why we don't believe it is acceptance of

4   responsibility.

5          THE COURT:  Well, my problem, you give

6   me so many cases, I find days it's hard to

7   remember their faces, let alone from six months

8   ago, without a transcript.

9          MR. TAYLOR:  May I, Your Honor?

10         THE COURT:  I guess that's the problem.

11  Unless they do something so outrageous or

12  unusual, they're just another name, another case,

13  and I can't remember what Mr. Quinlan did back in

14  September.  If I only had to take care of a

15  portion of these cases, I'd be in a better

16  position, but I've got everyone, plus a couple

17  hundred civil.  Agents out there remember

18  everything, give them a couple hundred more

19  cases, they'll be like me.

20         MR. TAYLOR:  Your Honor, if we allow him

21  the two points for acceptance of responsibility,

22  and if Mr. Miller then, if we won that argument,

23  would be as kind to give him the point for no

24  litigation we'd be down to 27.  Now, Ms. Brown

25  has not given us that, and that's the

1   Government's position.

2          We're also arguing, Your Honor, that he

3   shouldn't get the four points for organizer, and

4   I'll get to that in a moment, Your Honor.  That

5   leaves us -- we're finding an offense level of

6   29, Your Honor, and a criminal history of two.

7   Ms. Brown has found an offense level of 38 and an

8   offense level of two.  We are asking for the

9   lower, Your Honor.

10          Just one last comment, Your Honor,

11   organizer.  This is not --

12          THE COURT:  Was Mr. Caswell an

13   organizer, Mr. Miller?

14          MR. MILLER:  Yes, Your Honor.

15          THE COURT:  Okay, because I had listened

16   to him talking about his involvement with

17   Caswell, and it looked like they were joint

18   organizer and leaders.  You may continue.

19          MR. TAYLOR:  Thank you, Your Honor.

20   Your Honor, this Court has found before, in

21   arguments that I have lost, that even a

22   relatively simple structure, we can have a leader

23   or organizer, more than five people, and I don't

24   mean to say anything derogatory to small town

25   southern Illinois because I come from small town

1  southern Indiana, but this is a hillbilly

2  airline, Your Honor, and I don't think it's led

3  by anybody with any particular degree of

4  intelligence.

5         Thank you, Your Honor.

6         THE COURT:  Mr. Miller?

7         MR. MILLER:  And I want to be -- just to

8  be clear on what we're arguing right here, I

9  believe we were arguing the objection on relevant

10  conduct.  I think perhaps Mr. Taylor also put in

11  his argument on organizer or leader so I'll

12  address those.

13         I think the Court's concerns are valid

14  in this case as far as relevant conduct goes, as

15  far as what it's going to base it on.  In this

16  case we have pseudoephedrine logs that show

17  actual purchases of pseudoephedrine that were

18  used.  The reason for using relevant conduct is

19  to understand the scope of the undertaking.  Is

20  this where Mr. Quinlan manufactured a little bit

21  of methamphetamine on one occasion conspiracy, or

22  was this an ongoing conspiracy in which a large

23  amount of methamphetamine was manufactured.  The

24  evidence is clear it's the latter.

25         Mr. Taylor does want to ignore, one, the

1    purchases of pseudoephedrine made by the

2    defendant.  I don't think it is -- one, we have

3    the testimony of Mr. Caswell that Mr. Quinlan

4    provided pseudoephedrine that was used to

5    manufacture methamphetamine.  So we already have

6    this linked to the manufacture of amphetamine.

7    And we have just common sense, purchase on March

8    9, purchase on March 22nd, purchase on April

9    13th, people don't need to purchase 2.4 or 4.8

10    grams, three of those were 4.8 gram purchases, a

11    couple of boxes, that often.

12        He lost his license.  The day he gets

13    his license back, he immediately goes back to

14    Urbana and buys more pseudoephedrine, and all of

15    these purchases after Mr. Caswell and Ms.

16    Patterson get arrested so some of the source of

17    supply for pseudoephedrine is gone.

18        We have Mr. Quinlan going out himself

19    and making numerous purchases that are listed

20    here, sometimes two on one day.  April 15th,

21    2006, he goes to Wal-Mart in Watseka -- I'm

22    sorry, August 15th, goes back later that same day

23    and buys another box.  Ten days later he buys

24    another box in Indiana.  He's going to multiple

25    states, he's buying boxes of pseudoephedrine very

1   close time frames to each other.  So just on the

2   logs themselves, they support the conduct

3   relevant in this case.

4           That's absent the testimony of Mr.

5   Caswell, who the defendant has acknowledged as

6   providing credible testimony.  He's indicated --

7   again, if we just take his testimony during the

8   time that he was manufacturing with Mr. Quinlan,

9   that they were produc -- over twenty times they

10  went out and cooked methamphetamine using an

11  average of five to ten boxes.  If we take the

12  conservative low end, instead of taking seven and

13  a half or ten, we take five boxes right there,

14  we're talking over a hundred boxes of

15  pseudoephedrine; at 2.4 grams a box, we're

16  talking 240 grams of pseudoephedrine.  As he

17  discussed, five to ten grams of methamphetamine

18  per cook, we're talking 200 grams of

19  methamphetamine.

20          If we use those numbers, we would

21  actually increase the offense level under

22  relevant conduct.  We're not asking the Court to

23  do that.  We're simply asking the Court to rely

24  on the pseudoephedrine that we know from the logs

25  that were purchased and we know from the

1  statements of the individuals and Mr. Caswell's

2  testimony was used by Mr. Quinlan to manufacture

3  methamphetamine.

4          Again, much of this is, once he got his

5  license back, pseudoephedrine amounts that were

6  purchased by Mr. Quinlan himself.  And that's why

7  we do believe that the amount that's contained in

8  the presentence is, in fact, conservative, that

9  it is reliable information, it is appropriate

10  information for the Court to use to determine Mr.

11  Quinlan's relevant conduct, and that's why we ask

12  for that to be imposed.

13          As far as leader -- the leader

14  enhancement, the Court is correct, in fact, Mr.

15  Caswell received that enhancement himself when he

16  was sentenced.  His testimony, and the other

17  witnesses, indicate that they were the top of the

18  chain.  In cocaine cases we have cocaine coming

19  from out of the country; we have a large

20  distribution chain.  We have somebody in Columbia

21  or somebody in Mexico.

22          As far as methamphetamine goes, Mr.

23  Quinlan and Mr. Caswell were at the top of the

24  chain.  They're the ones who were producing the

25  methamphetamine.  They're the ones who are making

1    it.  They're the ones who decide who gets how

2    much methamphetamine in exchange for the

3    pseudoephedrine pills, how much they distribute,

4    who gets paid what for the boxes, when there's

5    going to be a cook.  We believe it's entirely

6    appropriate for Mr. Quinlan and Caswell -- who

7    Mr. Caswell testified directed people to go out

8    and purchase pseudoephedrine pills to receive

9    this enhancement.

10          And, therefore, we are asking this Court

11    to find that the Probation Officer got it right

12    when she determined relevant conduct, that she

13    got it right when she applied the enhancement for

14    leader/supervisor of an organization that clearly

15    involved more than five or more people, and we

16    ask the Court to rule in the Government and the

17    Probation Officer's favor.

18          THE COURT:  Anything further, Mr.

19    Taylor?

20          MR. TAYLOR:  No, thank you very much,

21    Your Honor.

22          THE COURT:  As far as the relevant

23    conduct, if we did not have the logs which show

24    you now how easy it is to prove up, we used to

25    have to have testimony in the court from somebody

1  in the pharmacy that says I remember Mr. Quinlan,

2  he came in, I think he -- I think he took

3  everything off our shelf and that probably was so

4  many boxes.  We don't have that anymore.  All we

5  have to do is go find the pharmacies.

6          And because most people are real lazy,

7  they do their business around their own home

8  area, and it's pretty easy to find out.  They

9  don't drive to St. Louis or Chicago.  Maybe

10  they're worried if I go too far away they'll look

11  down and see my name and they'll send somebody to

12  follow me and watch me.  But, no, most of these

13  people go into the same pharmacies on a regular

14  basis, pretty much, when it's time to cook.

15  These why we get all these dates on the same

16  dates.

17          So most of the people who are involved

18  in the meth business aren't very smart, aren't

19  very sophisticated, and it's pretty easy to catch

20  them, and when you do catch them it's pretty easy

21  to prove up relevant conduct.

22          So these business records that Ms. Brown

23  has looked at, I haven't found anything that

24  would discount them.  The Court finds by a

25  preponderance of the evidence that page 6,

1   paragraph 14, through page 9, paragraph 14, has

2   properly been calculated by a preponderance of

3   the evidence, 151.2 grams equals 1,510 kilos,

4   which is in excess of 1,000, which produces the

5   offense level 32.

6           Court's heard the testimony of Daniel

7   Caswell in support of that, and all that does is

8   support the interaction between Mr. Quinlan, Mr.

9   Caswell, and the conspiracy, as well as the

10  purchases were occurring.  That's what the logs

11  support.  So we have a situation of two people

12  organizing, leading, and all of the different

13  names have been testified to and are set forth on

14  the log in paragraph 14.  So under the advisory

15  sentencing guidelines we have appropriate

16  calculation of relevant conduct, and we have the

17  four-level increase for being a leader or

18  organizer conspiracy.

19          Let me go back and look at paragraphs 26

20  through 29, because we have five or more

21  participants -- organizer or leader of criminal

22  activity was involved five or more participants

23  or was otherwise extensive.  Look at the dates,

24  look at the numbers, 13 individuals.  Look at the

25  logs, it certainly is five or more, it certainly

1    is extensive, and it certainly is the conspiracy

2    that Mr. Caswell testified to.

3             Therefore, as to the unresolved

4    objections, first, relevant conduct, Court adopts

5    the position of the Probation Officer and the

6    Government by a preponderance of the evidence.

7    As to the four-level increase for being a leader

8    or organizer, the Court find sufficient facts to

9    support it, adopts the position of the Government

10   and the Probation Officer by a preponderance of

11   the evidence.

12           Mr. Quinlan, Mr. Taylor Mr. Miller have

13   reviewed the presentence report in its entirety

14   and those -- and without objections to anything,

15   in addition to what has been now decided, the

16   Court has reviewed pages 1 through 20, paragraph

17   1 through 82, and based on its rulings and the

18   unobjected to paragraphs, the Court adopts the

19   entire presentence report by a preponderance of

20   the evidence on today's date.

21           Based on -- Mr. Taylor?

22           MR. TAYLOR:  Your Honor, this is my

23   fault.  We had meant to raise acceptance of

24   responsibility.

25           THE COURT:  Yes, and I was going to

1  address that when it came to sentencing.  It was

2  not raised in objection; I heard it in your

3  argument.  Mr. Miller responded to it, and while

4  I can't exactly remember what Mr. Caswell said at

5  the time -- I mean, not Mr. Caswell, Mr. Quinlan

6  said at the time he pled guilty, I know what Mr.

7  Miller said, and Mr. Miller said that they were

8  ready for trial a week after, meaning the

9  following week, the 10th.

10          Does that sound right, Mr. Taylor?

11          MR. TAYLOR:  Your Honor, I always

12  believe Mr. Miller tells the truth.

13          MR. MILLER:  He pled guilty on the

14  Friday before the trial.

15          THE COURT:  That's what I thought he

16  said.  And while I said I didn't remember what

17  said in the transcript, I certainly know Mr.

18  Miller well enough to know that it's too late to

19  get acceptance of responsibility, because if the

20  Court gave Mr. Quinlan acceptance of

21  responsibility the for that he would go back to

22  the jail and say wait until the last minute,

23  judge will give me acceptance and that would sure

24  bedevil that prosecutor.  He'll have to have all

25  those Government witnesses lined up, he'll have

1  to have worked his butt off and he won't get --

2  I won't get punished for it; I won't lose any

3  acceptance.

4          So let's just have Judge McCuskey go to

5  the Friday before every trial, screw his trial

6  week up, screw the Government up, maybe give

7  Judge McCuskey another heart attack, give the

8  Government a lot of problems, and I'll get

9  another benefit.  Doesn't work that way, Mr.

10  Quinlan.  Doesn't work that way.

11          Now, then, somebody might go back to the

12  jail and say now Judge McCuskey says there's no

13  benefit for saving him from a trial so if you're

14  not going to get acceptance might as well go to

15  trial.  That's fine.  Make a decision whether you

16  testify, make a decision whether you commit

17  perjury, maybe obstruct justice, maybe the

18  sentence will be greater.

19          All these things you looked at in the

20  big picture when it's over, and that's why we

21  sentence under 18 USC Section 3553A, the

22  character, the history, the sentence is

23  sufficient and appropriate and reasonable and not

24  greater than necessary, and not just the advisory

25  guidelines, which we look at for advice and

1  guidance.  There's a lot more to it.

2          So Mr. Miller is correct.  Even if you

3  had raised it, it is too late.  The Government

4  was prepared; it was the Friday before.  Probably

5  many of these agents had to change their

6  schedules, many them had to change, who knows,

7  vacation plans, family plans.  So there's a lot

8  of people involved in getting ready for a trial,

9  plus all the jurors who have to be contacted at

10  the last minute, who have to change their life

11  plans for the following Monday.  So, no, this is

12  not an acceptance of responsibility case.  If

13  raised, it would have been denied, so that's

14  clear on the record.

15          Anything further, Mr. Taylor?

16          MR. TAYLOR:  Your Honor, I think we need

17  a clean record.  When we're back here again, I

18  think -- I think, even though it was raised late,

19  I think that's always an issue, acceptance of

20  responsibility.  So I would -- to make the record

21  clear, I think that the Court -- I think it's

22  always timely before you rule; I think, in fact,

23  the Court did consider it very thoroughly, very

24  thoroughly.  And so I think -- if it please the

25  Court --

1              THE COURT:  No, I've allowed you to

2    raise it.

3              MR. TAYLOR:  I just want to make sure --

4              THE COURT:  It's been raised, and I've

5    ruled on it.

6              MR. TAYLOR:  Judge, that's all I want.

7    Thank you.

8              THE COURT:  It isn't a question of you

9    forgetting, it may be a question it's not been

10   typed, but it's been orally raised, orally

11   argued, orally ruled on by a preponderance of the

12   evidence.  It wasn't missed by the Court or you

13   or the Government.

14            Okay.  Anything further, Mr. Taylor?

15             MR. TAYLOR:  No.  Thank you, Your Honor.

16             THE COURT:  That's why we set two hours

17   aside.

18            Based on the calculations of the Court,

19   the rulings of the Court, the defendant has an

20   offense level of 38, criminal history category

21   2.  Under the statute, he faces a minimum

22   mandatory 5 to 40, probation's not authorized,

23   supervised release not less than four years,

24   restitution, the hazardous waste cleanup costs

25   are an undetermined amount, the fine of up to two

1   million dollars if he has the ability to pay,

2   special assessment mandatory in the amount of

3   $100.

4          Ms. Brown, has the Court accurately

5   stated the statutory provisions?

6          MS. BROWN:  Yes, Your Honor.

7          THE COURT:  Mr. Miller?

8          MR. MILLER:  Yes, Your Honor.

9          THE COURT:  Mr. Taylor.

10          MR. TAYLOR:  Yes, Your Honor.

11          THE COURT:  Without the defendant losing

12   his right to appeal, the Court has calculated 38,

13   based on its rulings, and criminal history

14   category 2, advisory guideline's 262 to 327 for

15   custody, probation's not authorized, supervised

16   release four to five years, hazardous waste

17   cleanup costs of an undetermined amount, fine

18   range twenty-five thousand to two million if the

19   defendant has the ability to pay, mandatory

20   special assessment of $100 pursuant to statute

21   and the advisory guidelines.

22          Ms. Brown, has the Court accurately

23   stated the guideline provisions advisory, that

24   they are for offense level 38, criminal history

25   category 2.

1           MS. BROWN:  Yes, Your Honor.

2           THE COURT:  Do you agree, Mr. Miller?

3           MR. MILLER:  Yes.

4           THE COURT:  Without waiving the right to

5    appeal based on the calculations of the Court, do

6    you agree, Mr. Taylor?

7           MR. TAYLOR:  We do, Your Honor.

8           THE COURT:  Any witnesses in

9    aggravation, Mr. Miller?

10          MR. MILLER:  No, Your Honor.

11          THE COURT:  Any witnesses in mitigation,

12   Mr. Taylor?

13          MR. TAYLOR:  No, thank you, Your Honor.

14          THE COURT:  To let you know how we'd

15   proceed, Mr. Quinlan, the Government will make

16   its recommendation; Mr. Taylor will respond with

17   his recommendation.  You'll be given an

18   opportunity to address the Court.  You're not

19   required to.  It would be your choice, if you

20   wish, and if you do you'll join Mr. Taylor at the

21   podium.

22          Mr. Miller.

23          MR. MILLER:  Your Honor, this is a case

24   where, without doubt, the advisory guideline

25   range is a stiff sentence.  The United States

1  recognizes that, and we do recommend the sentence
2  at the bottom of the range of 262 months.  We
3  think that does -- although the defendant did not
4  receive acceptance of responsibility, under the
5  guidelines we do think, for one, that that does
6  at least appropriately reflect that the defendant
7  ultimately did plead guilty to the offense,
8  although we again continue to believe that he has
9  yet to fully accept full responsibility for the
10  offense.
11          In looking at the statute, we do believe
12  that the factors under the guidelines that create
13  this guideline range do make a sentence at the
14  bottom of that range, a sentence of 262 months
15  imprisonment, one that is appropriate under the
16  statute, one that is sufficient and is not
17  greater than necessary to achieve the purposes of
18  sentencing.
19          The first factor under 3553A is the
20  nature and circumstances of the offense.  In this
21  case, we're talking a methamphetamine
22  conspiracy.  And this Court, being in east
23  central Illinois, has seen, time and time again,
24  the effects of methamphetamine in the area, Coles
25  County and Edgar County, in Vermilion County and

1  in Iroquois County, persons whose lives are

2  destroyed by the addiction to methamphetamine.

3  It really is the scourge of this area, I think

4  perhaps more so than any other drug we have.

5           As I intimated before, the top of the

6  chain for methamphetamine offenses isn't somebody

7  who's outside the district or outside the

8  country, it's the persons who are manufacturing

9  this methamphetamine and distributing it to other

10 persons.

11          In this case the top of the chain is Mr.

12 Quinlan, and that's why he faces this offense

13 level.  He and Mr. Caswell were manufacturing the

14 methamphetamine, they were the ones who knew how

15 to produce it, they involved approximately 13

16 other people in this conspiracy, many of whom

17 were being provided with methamphetamine, keeping

18 their addiction going, creating the problems we

19 see.

20          Obviously, it's not simply related to

21 methamphetamine.  We see so many other crimes

22 here, whether it's violent crimes or economic

23 crimes where people are trying to fuel their

24 addiction.  And we believe in this case, where

25 the defendant is involved in ongoing

1  methamphetamine manufacturing at this level, as

2  reflected in the relevant conduct, that a stiff

3  sentence is appropriate, and the 262-month

4  sentence is that sentence.

5         We recognize that in this case the

6  defendant, if he had accepted responsibility

7  early, or at any point, really, in this case,

8  perhaps his sentence -- well, his sentence, we

9  believe his guidelines would be lower and the

10  United States believe it would be recommending

11  that lower sentence.  He has not done that.  That

12  reflects the difference between him and Mr.

13  Caswell in this case and why they are facing

14  different sentencing ranges.

15         We believe that it's based on the nature

16  and circumstances of this offense that the

17  262-month sentence does reflect the seriousness

18  of the offense, will promote respect for the

19  law.  We do believe it's just punishment and

20  hopefully it will protect the public from further

21  crimes of Mr. Quinlan.  Because, as we've seen

22  from Mr. Caswell's own testimony, he went to the

23  hospital for about a week for dehydration, and

24  three days later he's arrested in possession of

25  pseudoephedrine pills.

81

1            There seems to be a high rate of
2    recidivism of persons involved in the manufacture
3    of methamphetamine, and this will protect the
4    public for some period of time.  We also hope
5    that it provides adequate deterrence, that the
6    message will get to those who are engaged in
7    methamphetamine manufacturing that if you engage
8    in large scale, ongoing production that you will
9    face a lengthy sentence, at least in east central
10   Illinois.
11            So we do ask for the sentence of 262
12   months imprisonment, do ask the Court to impose a
13   sentence of five years supervised release.  We
14   don't disagree with the findings in the
15   presentence report that no fine be imposed, and
16   we do ask the Court to impose the $100 special
17   assessment.
18            Thank you, Your Honor.
19            THE COURT:  Mr. Taylor.
20            MR. TAYLOR:  Thank you, Your Honor.
21   Your Honor, the 3553A, we would like to talk
22   about in two respects, our client's history and
23   characteristics primarily, Your Honor.  I think
24   that, in light of what I'm going to say next, Mr.
25   Miller's argument is even stronger that

1   methamphetamine is one of the most destructive

2   drugs that we've encountered, not only in the

3   state, but in this country.

4        Mr. Quinlan's a good example of that,

5   Your Honor.  If we look at his Social Security

6   earnings, Your Honor, which I think is the best

7   indicator, have always thought is the best

8   indicator of what a person's capable of because

9   it's what they've done, Your Honor, you'll see

10  that he was earning very good money, Your Honor:

11  2003, 26,000; '02, 28,000; '01, 26,000; 17,000 in

12  2000; and 1999, 27,771.

13       Now, as Your Honor remembered, he did

14  get a pretty good comp and PI settlement from his

15  2003 injury, but, Your Honor, those are not

16  reflected there.  That's nonreportable income,

17  Your Honor, you'll remember from your general

18  practice days.  So those are true earnings, Your

19  Honor his true earnings.

20       But then he tries meth for the first

21  time after this auto accident in 2003, and, well,

22  Your Honor, there we go down.  Next year he makes

23  $7,000 after making $26,000.  And here today,

24  Your Honor, with the criminal history, Your

25  Honor, of a six-month supervision conviction when

1  he was 21, a misdemeanor battery when he was 49,

2  Your Honor, where he got court supervision.

3         He engages in meth manufacture and now

4  he's at the bottom of the guidelines on 262, over

5  20 years, Your Honor.  That's what meth does to

6  people, gets them over 20 years in a federal

7  penitentiary after a lifetime of good work and

8  little criminal history.

9         And, Your Honor, it's for that reason

10  that I ask the Court under Kimbrough and Goll to

11  consider, Your Honor, that the minimal criminal

12  history in this case and the relatively short

13  period of duration of this enterprise combined,

14  Your Honor, with my client's work record would

15  give the Court a reason, we hope, to depart from

16  262 to a level below the Court felt was

17  appropriate.  Your Honor, I know that's asking a

18  lot, but it also says, Your Honor, 262 in this

19  criminal record.  Well, Your Honor, that's a lot

20  of time, and I think 327 is even, really, over

21  the top, but then I didn't formulate the

22  guidelines, Your Honor.

23         Your Honor, I don't believe my client

24  wishes to allocute, but if I could have one

25  moment, please.

```
 1              THE WITNESS:  Yes, Your Honor.  I will
 2    make this brief.  In December, December 4th,
 3    2003, I was involved in a head-on collision on
 4    Route 49 about a quarter mile south of Danforth
 5    on Route 49 in Iroquois County.  That is when I
 6    was not able to work for a long time.  I had four
 7    broken ribs, a punctured lung, a concussion, a
 8    lot of other damage.  It's in the medical report
 9    here.  I had a surgery.  I could probably show
10    you where they drilled a hole in here for my
11    punctured lung right here at Carle Clinic.
12              At that time I had to stay home for
13    months and months.  At that time, when I was
14    taking all kinds of medication for pain and stuff
15    like that, is when I started doing this.  And
16    since I couldn't go to work and all the boredom
17    and with the medication, I wasn't allowed to
18    drive because of the medication, and these people
19    just kept coming by and I got addicted to this.
20    Well, it got out of hand.
21              You know, I don't have much of a
22    criminal history.  I wouldn't have a lot of
23    this.  In fact, a little battery charge I had in
24    '04, I believe -- yeah, '04 or '05, probably
25    wouldn't have happened if it weren't for the
```

85

1   meth.

2           And not -- changing my plea before the

3   last date, but on the day before that is when my

4   lawyer called me and told me he wouldn't

5   recommend me -- if I would have been called two

6   weeks before that -- he recommended to me that it

7   was hopeless, that I couldn't win the case, I

8   would've changed my plea then.  I waited for my

9   attorney because I'm not a very smart person when

10  it comes to law.  I depend on my lawyer.

11  Otherwise, I would have changed my plea earlier

12  than that, but I have to hear from him because I

13  don't know what to think or I'm scared to death

14  all the time of this.  I would have changed it

15  earlier if I would have been told earlier.

16          I think that's about it, Your Honor,

17  that I can think of at the moment.

18          THE COURT:  Mr. Quinlan was before me

19  with Mr. Taylor on June the 7th here in open

20  court, on June -- July 18th for a status

21  conference, for -- on August 29th, and that's the

22  first time that I've ever heard somebody say that

23  Mr. Taylor waited until the last minute, because

24  he never does, I guess, except in your case.  So

25  maybe that just ties right into what Ms. Brown

1  said and Mr. Miller said, that you've got a tough

2  time accepting responsibility for your actions.

3         Now, let me say what I think about

4  methamphetamine   What I've seen here as a judge,

5  it does far more damage than crack cocaine.  It

6  is the number one drug for ruining people's

7  lives, ruining their minds, their families, and,

8  clearly, you're still not thinking well.

9  Rationalizing the use, talking about people

10  coming to see you, as if all a sudden all these

11  people, including your lawyer, just conspired to

12  ruin your life.

13        Well, if I had given you acceptance of

14  responsibility and you had an offense level of

15  36, criminal history category 2, your range would

16  have been 210 to 262 months, and you would have

17  received 262 months.  It would not make a

18  difference at all, because I usually sentence at

19  the top of the guidelines in meth cases because I

20  see the damage.

21        And when I see it in a trial and when it

22  becomes more obvious from the pictures, from the

23  testimony, if you had gone to trial, you'd be

24  looking at 327.  If you would have taken the

25  stand and testified as poorly as you just did, I

1  would have -- the jury would have convicted you

2  anyway and I probably would have found an attempt

3  to obstruct justice and maybe more.

4          So even if Mr. Taylor somehow didn't

5  convince you until the last minute, he served you

6  well.  Because today the Government didn't stand

7  up and ask for the maximum of 327, which would

8  have been well in order, but somehow, looking at

9  your character and history or the fact that come

10 late to the altar but at least you came, even

11 though we have a question as to whether your

12 motives were because you wanted to accept

13 responsibility, you're not looking at 327.

14 Because if the Government asked for it, you'd be

15 getting it.

16         So, no, you're getting 262, which is

17 what you would have gotten with acceptance of

18 responsibility.  So Mr. Taylor didn't drop the

19 ball.  He didn't in any way prejudice you or cost

20 you anything.  You're getting 262 months because

21 this is a serious offense.  It is a growing

22 problem.  It is a problem that can take somebody

23 who's led a life of work, a law-abiding life,

24 basically, and turn it upside down to the point

25 that you can't even accept responsibility for

1  ruining your life.  It's somebody else's fault.

2           You look pretty good.  Most of the

3  people that come in look like Mr. Caswell when he

4  came in.  I remember Mr. Caswell.  He looked

5  dead.  Now he looks well.  And most of the people

6  that come in for meth look dead and parts of

7  their bodies have burns or they've been picking

8  at their skin.

9           I remember the one gentleman who -- he

10  was bored and he used meth and he thought -- he

11  hallucinated and thought something was inside his

12  skin.  So while he was bored and staying up

13  indefinitely, he picked at his veins.  And he

14  stayed awake long enough to get gangrene and had

15  to have all kinds of surgeries.

16           The course of meth, I've seen people

17  live without running water and toilets in

18  trailers, ruining their families, their health,

19  and their lives, while they pick apart a TV set

20  piece by piece.  You're lucky it hasn't ruined

21  your health.

22           You talked about getting hit head on,

23  you got hit head on with this conspiracy, head on

24  with this drug, head on to the point you still

25  don't know what it did to you.  It has done what

1   it does to other people, it's clear.  It puts
2   holes in your brain.
3           Chemical.  You know how to make it now.
4   When's the last time that you had battery acid
5   and took a shot of it for a little relief?
6   When's the last time you took a little lye and
7   all of the other kinds of ingredients and said
8   this will be good for my body, this will be good
9   for others, this will be good for all of us.
10          No, it isn't just cold medication.  You
11  know the poisonous chemicals that go into it
12  because you know how to cook and manufacture it.
13  It has ruined you and it has ruined others, and I
14  view it as the most serious offense, other than
15  child pornography, that comes in front of me on a
16  regular basis.
17          So, as long as I sit here, those people
18  who are out there organizing -- and look at the
19  sales and the people involved.  This was a large
20  conspiracy.  The seriousness of the offense, a
21  message needs to be sent to promote respect for
22  the law and provide just punishment, deter
23  others, and protect the public.  How many people
24  think well, it's not crack cocaine, it's not
25  powder cocaine, it's just a little ice.  It will

1   keep you up a little longer to help you study for

2   an exam.  Well, it's not that simple.

3          So to insure fair and consistent

4   sentences, I do sentence on the high side in meth

5   cases.  So instead of going to trial and losing,

6   which you certainly would have done, you

7   certainly would have received from this Court no

8   less than 327 months.

9          So Mr. Miller says let's look a little

10  bit at the character and history, Mr. Taylor says

11  look at the character and history, the Government

12  recommends 262.  That is the leniency you

13  receive; that is the lowest sentence that I could

14  ever afford you under these facts and

15  circumstances.

16         It would have been easy to do 327, but

17  you didn't go to trial.  It would have been easy

18  to do more, all the way up to 40 years, if you'd

19  taken the stand and lied, because you still do

20  not accept responsibility for your actions or

21  believe that it has harmed anybody, let alone

22  you.

23         Pursuant to the Sentencing Reform Act of

24  1984, it's the judgment of this Court that the

25  defendant, Robert Michael Quinlan, is hereby

1   committed to the custody of the Federal Bureau Of

2   Prisons for a term of 262 months.  Due to

3   extensive family ties, the Court recommends to

4   the Bureau of Prisons that the defendant be

5   housed in the Midwest for visitation.  Another

6   thing, a sentence of less than 262 months would

7   deprecate the seriousness of this crime, this

8   conspiracy and this offense.

9           The Court finds the defendant is an

10  addict, therefore recommends to the Bureau of

11  Prisons that he receive intensive and

12  comprehensive drug and alcohol rehabilitation

13  while in the Bureau of Prisons.  The Court finds

14  the defendant does not have the ability to pay a

15  fine, either immediately or through installment

16  payments.

17          Upon release from imprisonment, the

18  defendant shall be placed on supervised release

19  for a term of five years.  Within 72 hours of

20  release from the Bureau of Prisons he will report

21  in person to the Probation Office in the district

22  to which he's released.  Court finds the

23  defendant subject to the mandatory drug testing

24  provisions of 18 USC Section 3583D and orders the

25  defendant submit to one drug test within 15 days

1   after being placed on supervision and two drug

2   tests thereafter as directed by the

3   U.S. Probation Office.

4           In addition, pursuant to 42 United

5   States Code 14135A, you will cooperate in the

6   collection of DNA.  In addition to the standard

7   conditions of supervision, you will comply with

8   the following special conditions:  You shall not

9   own, purchase, or possess a firearm, ammunition,

10  or other dangerous weapon; shall refrain from any

11  use of alcohol; shall not purchase, possess, use,

12  distribute, or administer any controlled

13  substance or any paraphernalia related to any

14  controlled substance, except as prescribed by a

15  physician;

16          Shall, at the direction of the Probation

17  Office, participate in a program for substance

18  abuse treatment, including not more than six

19  tests per month, to determine whether -- the use

20  of controlled substances and/or alcohol; shall

21  pay for these services as directed by the

22  Probation Office; shall obtain a GED during the

23  term of supervision; pay a special assessment to

24  United States in the amount of $100, which shall

25  be due and payable immediately.

1          You have the right to appeal my findings

2     on your three issues, relevant conduct,

3     organizer/leader, acceptance of responsibility

4     where the Court ruled against you on all three.

5     You have an opportunity to appeal those findings,

6     the judgment, the sentence today, and all the

7     proceedings in your case, if you wish.

8          There are three ways you can file and

9     perfect a notice of appeal to the 7th Circuit

10    Court of Appeals.  You can, one, request the

11    Clerk of the Court to file a notice of appeal on

12    your behalf; two, you can file your own notice of

13    appeal with the Clerk of the Court; or, three,

14    you can direct Mr. Taylor to file a notice of

15    appeal on your behalf.  Any of these three

16    methods will perfect an appeal to the 7th Circuit

17    if they're done in the next ten days.

18          Do you have any questions about your

19    appeal rights, Mr. Quinlan?

20          THE WITNESS:  No, I just instructed Mr.

21    Taylor that I would like to appeal.

22          THE COURT:  Okay.  The Court will direct

23    the Clerk of the Court on behalf of Mr. Quinlan

24    to file a notice of appeal in this case, and that

25    perfects it, Mr. Quinlan.  Because the Court's

1  previously found you to be indigent, the Court of

2  Appeals will appoint an attorney to represent you

3  on the appeal, and the attorney will be provided

4  by the court with a transcript of the proceedings

5  that the attorney believes he needs to appeal.

6  So that is taken care of.  That's no longer an

7  issue or a question.

8            Anything further, Ms. Brown?

9            MS. BROWN:  No, Your Honor.

10           THE COURT:  Anything further, Mr.

11 Miller?

12           MR. MILLER:  No, Your Honor.  Thank

13 you.

14           THE COURT:  Mr. Taylor?

15           MR. TAYLOR:  No, thank you, Your Honor.

16           THE COURT:  Good luck, Mr. Quinlan.  Mr.

17 Quinlan is remanded to the custody of the United

18 States Marshal to be transported to the Federal

19 Bureau of Prisons.

20

21

22

23

24

25

95

```
1  STATE OF ILLINOIS )
                     )  SS
2  COUNTY OF MC LEAN )

3

4

5

6

7       I, FRAN A. ANDERSON, do hereby certify that I

8  am a court reporter doing business in the City of

9  Bloomington, County of McLean, State of Illinois;

10 that I reported in machine shorthand the

11 testimony given at the taking of said hearing;

12 that the transcript is a true record of the

13 testimony given at the hearing; and that the

14 foregoing is a true and correct transcript of my

15 shorthand notes so taken as aforesaid.

16

17

18

19                         FRAN A. ANDERSON, CSR
                           301 West White Street
20                         Champaign, IL  61820
                           (217) 356-5119
21                         CSR No. 084-002930

22

23

24

25
```