**E-FILED**
Friday, 18 April, 2008  03:25:12 PM
Clerk, U.S. District Court, ILCD

1                    UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT OF ILLINOIS
2                          URBANA DIVISION

3

UNITED STATES OF AMERICA,       )
4                               )    Docket No. 07-20044
              Plaintiff,        )
5                               )
        vs.                     )    Urbana, Illinois
6                               )    SEPTEMBER 7TH, 2007
ROBERT MICHAEL QUINLAN,         )    9:00 A.M.
7                               )
              Defendant.        )
8

9

                     TRANSCRIPT OF PROCEEDINGS
10                        CHANGE OF PLEA
          BEFORE THE HONORABLE MICHAEL P. McCUSKEY
11            CHIEF UNITED STATES DISTRICT JUDGE

12

13   A P P E A R A N C E S :

14

     For the Plaintiff:      MR. EUGENE L. MILLER
15                           Assistant U.S. Attorney
                             201 South Vine Street
16                           Urbana, IL   61802

17

18   For the Defendant:      MR. JOHN C. TAYLOR
                             Assistant Public Defender
19                           300 West Main Street
                             Urbana, IL  61801
20

21   Court Reporter:         TONI M. JUDD, CSR
                             United States Court Reporter
22                           201 South Vine Street
                             Urbana, Illinois  61802
23                           (217) 373-5835

24

     Proceedings recorded by mechanical stenography; transcript
25   produced by court reporter.

1                    THE COURT:  This is the United States of

2    America, plaintiff, v. Robert Michael Quinlan, case number

3    07-20044.  Present in open court is Robert Michael

4    Quinlan.  He is accompanied by his attorney, John Taylor.

5    The United States Attorney, Assistant Eugene Miller

6    present.

7                    Mr. Miller, who accompanies you at counsel

8    table?

9                    MR. MILLER:  This is Trooper Ken Massey of

10   the Illinois State Police.

11                    THE COURT:  Is he the case agent?

12                    MR. MILLER:  Yes, Your Honor.

13                    THE COURT:  The defendant is present as I

14   indicated.  He was last here in my court on August 29th at

15   which time a final pretrial conference was held and the

16   case was set on the jury trial calendar -- actually it was

17   set on the jury trial calendar earlier than that -- well,

18   it's the same day.

19                    There's a lot of docket entries from that day

20   because the witness list, exhibit list, statement of the

21   case were all filed and the court gave the parties until

22   September 6th to file any objections, which, of course,

23   was yesterday's date, which was the motion deadline.

24                    So the final pretrial concluded on August 29th

25   with the parties being advised that the matter was set for

1    jury selection on next Monday, September 10th.  The

2    Clerk's Office advised the court this week that they have

3    notified all of the jurors of their requirement to be here

4    at 9 o'clock on September 10th.  The estimated length of

5    trial is three to four days, and the court has set aside

6    four days on its calendar next week for the trial of this

7    case.

8                    The court then made an ends-of-justice

9    finding, a period of delay would be excluded from the time

10   limits for commencing trial, which would be September

11   10th.

12                   The court was advised yesterday by my

13   Administrative Assistant that Mr. Taylor had contacted her

14   indicating that Mr. Quinlan wished to change his plea from

15   not guilty to guilty and waive his right to a trial by

16   jury.

17                   Mr. Taylor, is that correct?

18                   MR. TAYLOR:  That's correct, Your Honor.

19                   THE COURT:  Mr. Quinlan, is that your

20   desire?

21                   THE DEFENDANT:  Yes, it is, Your Honor.

22                   THE COURT:  I need you to stand and raise

23   your right hand and you will be administered an oath.

24                   ROBERT QUINLAN, DEFENDANT SWORN

25                   EXAMINATION BY THE COURT:

1         Q.    Mr. Quinlan, to make the record clear,  since

2    you were here on August 29th,  you and I have not had any

3    contact whatsover;  is that correct?

4         A.    That's correct.

5         Q.    So that this decision to change your plea on

6    the Friday before the Monday jury trial, that's your

7    decision?

8         A.    Yes.

9         Q.    The court hasn't forced you, have they?

10        A.    No, they haven't.

11        Q.    But you have had, now, contact with Mr. Taylor

12   relative to a written plea agreement; is that correct?

13        A.    Yes, sir.

14              MR. MILLER:  It's an open plea of guilty.

15              THE COURT:  Okay. I just wondered.  Mr. Taylor,

16   have you seen the United States' proposal relative to the

17   plea of guilty?

18              MR. TAYLOR:  Your Honor, I have.

19              THE COURT:  And that was just filed.   So in

20   that open plea it sets forth a factual basis for Mr.

21   Quinlan's plea, the rights that you are giving up, it also

22   means that you today -- and it is a lengthy factual basis.

23              Have you had a chance to review it,  Mr.

24   Taylor?

25              MR. TAYLOR:  I have, Your Honor.

1               THE COURT:  Does that factual basis comport

2     with the discovery you received in this case?

3               MR. TAYLOR:  With the discovery, may I add,

4     Your Honor?

5               THE COURT:  Yes.

6               MR. TAYLOR:  Here today we will specifically on

7     the record admit to facts sufficient to support the

8     government's charge beyond a reasonable doubt.

9               Certain facts, Your Honor, will be hotly

10     contested in regard to offense level at sentencing so we

11     will not admit to those today.

12               But we will, I am sure, Your Honor, provide you

13     with sufficient factual information wherein you can

14     conclude this is a knowing and voluntary plea.

15               Thank you, Your Honor.

16               THE COURT:  You always sit down.  I don't talk

17     enough to keep you standing.  The discovery in this case,

18     you have gone over with Mr. Quinlan, I am sure, at length?

19               MR. TAYLOR:  At great length, Your Honor.

20               THE COURT:  And the factual basis that would

21     support the elements of the offense you have discussed

22     with Mr. Quinlan?

23               MR. TAYLOR:  I have, and, again, Your Honor,

24     this morning Mr. Miller, because of the gravity of the

25     turn-around in this case, supplied me this morning with

1    the written plea charged which my client and I have

2    reviewed this morning.  Thank you, Your Honor.

3              THE COURT:  Mr. Quinlan, you've discussed the

4    discovery in this case with Mr. Taylor; is that right?

5         A.    Yes, I have.

6         Q.    Has he forced you to plead guilty?

7         A.    No.

8         Q.    Has he threatened you to get you to change your

9    position relative to a jury trial?

10        A.    No, I wouldn't say he threatened me.

11        Q.    Well, he has given you what his advice is, what

12   your chances of success are,  right?

13        A.    My chances of success and what could happen to

14   me if I failed.

15        Q.    So that's not a threat, right?

16        A.    No.

17        Q.    He is in effect giving you his professional

18   opinion?

19        A.    Yes.

20        Q.    Now, you are reaching your own opinion as to

21   how you wish to proceed, right?

22        A.    Yes.

23        Q.    And your opinion has not been because Mr.

24   Taylor has threatened you or forced you to do it.  You

25   have determined to do this because you believe it's in

 1    your best interests?

 2         A.    I guess I would say that, yes.

 3         Q.    And are you doing it also because you are

 4    guilty of what the government charged you with?

 5         A.    I am guilty of parts of it, like he said.  Like

 6    he said, there are issues that will be hotly contested.

 7         Q.    Well, I am going to go through what you are

 8    charged with and we are going to see if that's what you

 9    are pleading guilty to because I want it clear.  If you

10    are pleading guilty just to get this over with, I am not

11    going to accept your plea.  But you, if you're pleading

12    guilty because what the governments charged you with, not

13    the factual basis, but what they've charged you with, the

14    elements of the offense, if you committed the elements of

15    the offense and you are admitting them freely,

16    voluntarily, without any force, threats, promises or

17    coercion from your attorney or the government, then I will

18    accept, but I do not want you to give up your

19    constitutional right to a trial by jury because somebody

20    pressured you.  I want to know that it's your free and

21    voluntary decision. Do you understand that?

22         A.    Yes.

23         Q.    Now, I want to ask you a lot of questions just

24    to make sure that it's a valid plea; and for it to be a

25    valid plea, it means you have to understand the rights

1    that you have, the rights that you are giving up, it also

2    means that you have to understand the charge against you,

3    the legal elements of the offense, what the government

4    would have to prove to a jury beyond a reasonable doubt

5    next week before you could be convicted, and how that jury

6    process would work before I accept your plea which would

7    give it up, meaning to have a valid plea you have to know

8    the rights you have, the rights you are giving up.

9    You have to know the potential penalties you face and the

10   consequences of a plea of guilty.  And you have to do that

11   freely and voluntarily.

12             So I am going to be asking you a number of

13   questions that if you don't understand them and you say,

14   Judge, you know I just didn't get that, would you repeat

15   it, I will gladly do that.

16             Or if you say, Judge, could you say that in a

17   different way, I just don't understand those legal terms,

18   I will gladly do that.

19             Or if at any time you want to talk to Mr.

20   Taylor, your attorney, before you answer a question, feel

21   free to do that, because I want to make sure you have an

22   ample opportunity to understand my questions, and an ample

23   opportunity to counsel with Mr. Taylor and an ample

24   opportunity to answer, because it's essential to a valid

25   plea that you answer carefully and honestly each time.  Do

1    you understand that?

2           A.    Yes, I do.

3           Q.    Also, you have just taken an oath.  That

4    means the answers to my questions will subject you to the

5    penalty of perjury or of making a false statement if you

6    do not answer truthfully.

7                 Both perjury or of making a false statement

8    are criminal offenses that if you were convicted would

9    carry with them a penalty of up to five years

10   imprisonment, and up to a $250,000 fine, if you had the

11   ability to pay, and a conviction for perjury, of making a

12   false statement would carry with it a consecutive

13   sentence, meaning it would be consecutive up to five years

14   from any sentence you would receive in this case.

15                 It is very important that you answer

16   carefully and honestly.  Do you understand that?

17          A.    Yes, I do.

18          Q.    How old are you, Mr. Quinlan?

19          A.    I am 52.

20          Q.    How far did you go in school?

21          A.    I believe the eleventh grade.

22          Q.    Where was that?

23          A.    Watseka, Illinois mostly.

24          Q.    So you grew up in that Iroquois County

25   area?

```
1              A.      Yes, I did.
2              Q.      And after you left -- and all of that
3    education was in the English language?
4              A.      Yes, it was.
5              Q.      After you left school in the eleventh
6    grade, did you ever receive a high school equivalency or a
7    GED?
8              A.      No, I didn't.
9              Q.      Did you ever take any trade or technical
10   college or junior college classes after you left school?
11             A.      I was a union laborer and they had classes
12   for me in various things on the job.
13             Q.      Part of the trade?
14             A.      Part of the trade.
15             Q.      And that was in the English language?
16             A.      Yes, it was.
17             Q.      Mr. Taylor, are you satisfied that
18   Mr. Quinlan can speak, read, write, and understand the
19   English language?
20                     MR. TAYLOR:  I am, Your Honor.
21                     THE COURT:  Have you had a chance to talk
22   with him where he has had to read written documents?
23                     MR. TAYLOR:  I have, Your Honor.
24                     THE COURT:  And has he responded in a
25   manner that would give you an opinion that he understood
```

1     those documents?

2              MR. TAYLOR:  He does, Your Honor.

3              THE COURT:  Do you have any doubt about his

4     mental competency to enter into a free, voluntary, knowing

5     and intelligent plea today?

6              MR. TAYLOR:  I do not, Your Honor.

7              THE COURT:  Mr. Miller, obviously you have

8     prepared for trial.  It's the eve of trial and I am

9     certain many of the witnesses that you have dealt with

10    have had contact with Mr. Quinlan; is that correct?

11             MR. MILLER:  Yes, Your Honor.

12             THE COURT:  And have any of those witnesses

13    given you any opinion or information that would cast doubt

14    on the opinion that Mr. Taylor just gave relative to

15    Mr. Quinlan's mental competence?

16             MR. MILLER:  None, Your Honor.  Speaking with

17    numerous witnesses they have indicated they have had

18    various degrees of contact with the defendant.  There has

19    been nothing that would suggest that he is not competent

20    to enter into a knowing, intelligent and voluntary guilty

21    plea today.

22             THE COURT:  Thank you, Mr. Miller.

23    Mr. Quinlan, have you ever been under the care of a

24    psychiatrist?

25             A.    No, I haven't.

 1          Q.     Are you under the care of a doctor for any

 2   condition that requires regular prescription drugs, say

 3   for asthma, arthritis, heart, any kind of a condition

 4   where you have to take a pill every day?

 5          A.     Yes, I am.  I am taking 2, 140 milligrams

 6   of pseudoephedrine now.

 7          Q.     Okay.  And what is that for?

 8          A.     Congestion.

 9          Q.     And do you take any other form of

10   prescription drug?

11          A.     In the same pill contains, I don't know, I

12   can't remember the name of the word it's five milligrams

13   of a drug that's for allergies.

14          Q.     So you have allergies and congestion.  You

15   take medication for that daily?

16          A.     Yes.

17          Q.     When did you last take them?

18          A.     A quarter after eleven last night.

19          Q.     Now, when you take that medication does it

20   have any effects that would keep you from being able to

21   understand what I am saying, keep you from understanding

22   written documents, keep you from understanding and

23   perceiving your surroundings?

24          A.     No.  It kind of messes with my sleep and it

25   makes me a little tired.  I can still understand

1    everything.

2         Q.    Are you so tired today that you are having

3    difficulty in either staying awake or understanding what I

4    am saying?

5         A.    No, I don't believe so.

6         Q.    So would it be fair to say that that pill

7    is not having any effect at this time on your ability to

8    understand these proceedings?

9         A.    No, I am not having any disability in that

10   way at all.

11        Q.    Are you taking any other form of

12   medication, over-the-counter or prescription?

13        A.    No, not today.

14        Q.    Yesterday?

15        A.    Or yesterday.

16        Q.    Okay.  So have you taken any, other than

17   what you have said, the pseudoephedrine, any narcotic

18   drugs, medicine, pills, or mood-altering substance other

19   than the pseudoephedrine that you just mentioned in the

20   last 24 hours?

21        A.    No.

22        Q.    Have you taken any alcoholic beverages in

23   the last 24 hours?

24        A.    No.

25        Q.    Have you ever been hospitalized or treated

1    for narcotic addiction?

2          A.      No.

3          Q.      How do you feel today physically?

4          A.      My legs are a little sore and my back hurts

5    a little.  I don't get enough exercise.

6          Q.      So just stiffness from the early morning?

7          A.      Stiffness from confinement.

8          Q.      Anything that would keep you from

9    understanding what I am saying today?

10          A.      I don't believe so.

11          Q.      Now, let me read to you the charge so there

12    is no question as to what I am going to be asking you,

13    whether you plead guilty or not.  The indictment of April

14    4th, 2007, you have had a chance to discuss that with Mr.

15    Taylor; is that right?

16          A.      Yes.

17          Q.      And he has also talked to you about the

18    evidence the government would be presenting next week in

19    support of that indictment.  Is that correct?

20          A.      That's correct.

21          Q.      It reads, in Count 1, the grand jury

22    charges from on or about March 2006 and continuing through

23    at least November 15th, 2006, in Iroquois County, in the

24    Central District of Illinois and elsewhere, that Robert

25    Michael Quinlan, the defendant herein, did knowingly and

1    intentionally conspire with others, both known and unknown

2    to the grand jury, to manufacture methamphetamine, a

3    Schedule II controlled substance, and the conspiracy

4    involved five grams or more of methamphetamine, in

5    violation of Title 21, United States Code, Sections 846,

6    841(a)(1), and 841(b)(1)(B)(8).

7              Objects of the conspiracy.  The objects of this

8    conspiracy included to obtain quantities of

9    pseudoephedrine and other precursors, which could then be

10   manufactured into methamphetamine; and to do so without

11   detection by law enforcement authorities.

12             3.  Means and methods of the conspiracy.

13   Among the means and methods by which the conspirators

14   conducted and participated in the criminal conspiracy are

15   the following:

16             The sale of products containing

17   pseudoephedrine has been restricted by state and federal

18   law to prevent pseudoephedrine from being used to

19   illegally manufacture methamphetamine.

20             To attempt or evade these restrictions and

21   avoid detection of the conspiracy, the defendant purchased

22   products containing pseudoephedrine at various and

23   different retail locations, including in different states,

24   at different times.

25             The defendant also attempted to evade these

1    restrictions and avoid detection of the conspiracy by

2    inducing others to purchase products containing

3    pseudoephedrine for the defendant by offering either money

4    or methamphetamine in exchange for their assistance.

5                        B.   The defendant and others then used

6    pseudoephedrine that they had obtained to illegally

7    manufacture methamphetamine.  All in violation of Title

8    21, United States Code Section 846 and 841(b)(1)(B)(8) and

9    Title 18, United States Code, Section 2.

10                       Mr. Quinlan, do you understand what you are

11   charged with in this case?

12            A.     Yes, I do.

13            Q.     Do you understand that's what you would be

14   pleading guilty to, the elements of the offense contained

15   in the indictment?

16            A.     Yes, I do.

17            Q.     Do you still wish to proceed with a plea of

18   guilty today?

19            A.     Yes, I do.

20            Q.     Do you understand if I accept your plea of

21   guilty what will then happen with your case?

22            A.     Yes, I do.  I would be moved onto a

23   sentencing date.

24            Q.     There won't be a trial next week?

25            A.     No.

1          Q.      If I accept your plea, do you understand

2    that?

3          A.      Yes, I do.

4          Q.      In fact, do you understand there won't be a

5    trial of any kind ever in this case with a juror or a

6    judge if I accept your plea?

7          A.      Yes, I do.

8          Q.      So, if I accept your plea today, I will

9    enter a judgment of conviction on the matter contained in

10   the indictment I just read, I will order probation to

11   prepare a presentence investigation report, give you more

12   information about you other than the limited information

13   that I have received today, and in about 120 days we would

14   set your sentencing.   Is that how you wish to proceed?

15         A.      Yes.

16         Q.      Anybody forced you to do that?

17         A.      No.

18         Q.      Threatened you in any way?

19         A.      No.

20         Q.      Promised you anything to get you to do

21   this?

22         A.      No.

23         Q.      And when I say, "promised," meaning

24   somebody says, you know, just get rid of your trial by

25   jury, we know exactly what Judge McCuskey is going to do,

1    we know exactly the sentence that he is going to give --

2    has anybody promised predicted or prophesied what will

3    happen at that sentencing hearing?

4          A.    Not a promise.

5          Q.    Now, I can tell you I can't promise you, I

6    can't predict what the sentence will be because I need to

7    have more information about you.  We will sentence you

8    under 18 U.S.C. Section 3553(a) under the statute.

9                Now the statute says -- and is there a

10   prior felony conviction?

11               MR. MILLER:  No, Your Honor.

12               THE COURT:  So with no prior felony

13   conviction, you face a mandatory minimum five years to a

14   maximum 40 years imprisonment; a maximum 2 million dollar

15   fine, if you have the ability to pay, a mandatory 4 years

16   of supervised release, and a mandatory $100 special

17   assessment.

18               Those are the potential penalties that you face

19   in this case.  I see in the open plea that you filed

20   today, Mr. Miller, it says a maximum of 5-year period of

21   supervised release and I just said a mandatory 4 years so

22   is it 4 to 5 years?

23               MR. MILLER:  Yes, Your Honor.

24               THE COURT:  Do you agree, Mr. Taylor?

25               MR. TAYLOR:  I do, Your Honor.

1              THE COURT:  And you would have to pay a $100

2      special assessment at the time of your sentence.  Do you

3      have any question about the maximum potential penalty you

4      face, which is up to 40 years?

5              A.     I understand everything.

6              Q.     Okay.  And do you understand the way the

7      case is set, because of statute, Congress has said I

8      cannot give you any less than a 5-year period of

9      imprisonment?  My hands are tied for anything less than

10     five years.  Do you understand that?

11             A.     Yes, I do.

12             Q.     Mr. Taylor, is there any discussion about

13     any cooperation and assistance in this case with any other

14     people who may be involved in this conspiracy

15             MR. TAYLOR:  Your Honor, if I may go beyond

16     that a little bit.  My client and I have discussed that

17     after he enters his plea, we may be talking to the

18     government about the possible cooperation.

19             I have also advised my client, Your Honor,

20     short of that, that under 18 3553(f), which is

21     colloquially referred to as the "safety valve," that we

22     have some option, not an option, Your Honor, well, it

23     would be an option, that my client prior to sentencing

24     tells the agents everything he knows, truthfully,

25     concerning the offense or offenses that required the same

1    course of conduct or common scheme or plan, which would

2    mean, Your Honor, that he wouldn't have to cooperate in

3    the sense of naming people up the chain, he may be

4    "safety-valve" eligible; so if we hit on all cylinders at

5    sentencing, I may be in a position to ask the court to

6    move below 60 months.

7           I know Mr. Miller will be opposing it hotly,

8    nonetheless, as a "safety valve," as the court well knows,

9    we don't have to have a motion from the government.

10   Thank you.

11          THE COURT:  But, and this is what I want to

12   make clear to Mr. Quinlan because he may not understand

13   all of the legal intricacies of what you just said, there

14   are two prongs to what you just said.

15          One, we might in the future, after today, make

16   a discussion about cooperation.  We might in the future

17   after today complete the process to become "safety-valve"

18   eligible.  That I think is what I heard because today he

19   is not "safety-valve" eligible, today there is no

20   cooperation agreement, so if I had to sentence him today

21   there isn't any way today I could give him a sentence of

22   less than 60 months.

23          MR. TAYLOR:  That is absolutely correct, Your

24   Honor.

25          THE COURT:  Do you agree, Mr. Miller?

1           MR. MILLER:  Yes, Your Honor.

2           THE COURT:  So that's why, Mr. Quinlan, I can't

3    promise or predict what your final sentence will be in the

4    future, 120 days from now, because there are a number of

5    things that need to happen to benefit you which aren't

6    here today.  There are a number of things that I would

7    need to see about -- your prior record, your history, your

8    characteristics that I don't know today, and in the next

9    120 days you will get a presentence report, if we accept

10   the plea today, you will get a presentence report,

11   Mr. Miller will get a presentence report, Mr. Taylor will

12   get a presentence report, and he will sit down with you

13   and determine what objections, if any, you have to do that

14   would affect your advisory sentencing guidelines, your

15   offense level, your criminal history, and your statutory

16   factors because you do get sentenced under the statute, 18

17   U.S.C. Section 3553(a).

18           We are required to calculate your criminal

19   history, your offense level, your advisory sentencing

20   guidelines for advice, for guidance.

21           Then the court moves to the statute, 18 U.S.C.

22   Section 3553(a) looks and considers your character and

23   history, looks at the statutory factors and then decides a

24   sentence that is appropriate and reasonably sufficient,

25   not greater than necessary.

1            If you have objections, Mr. Taylor has

2   objections, the government has objections, I first hear

3   the objections at sentencing and decide on them by a

4   preponderance of the evidence and then calculate the

5   advisory sentencing guidelines and then move over to the

6   statutory sentencing like I just said.  So today all I can

7   tell you is you face a mandatory minimum 60 months if I

8   had to sentence you today.  Do you understand that?

9        A.    I understand that.

10       Q.    You face a maximum of 40 years.  The only

11  thing I can tell you today I can't imagine in any way I

12  would sentence you to 40 years.  But I can't tell you

13  because I don't have enough information today, I don't

14  have the presentence report today, I can't promise or

15  predict or tell you what your final sentence is going to

16  be within that range.  Do you understand that?

17       A.    Yes, I do.

18       Q.    Do you understand that's a risk you take by

19  pleading guilty today, not knowing what your final

20  sentence will be?

21       A.    Yes.

22       Q.    Is that a risk you are willing to take?

23       A.    Yes, it is.

24       Q.    Anybody force you to do that?

25       A.    No.

1          Q.      Threaten you to do that?

2          A.      No.

3          Q.      Promise you anything to get you to do that?

4          A.      No.

5          Q.      Knowing all of that, are you still willing

6    to plead guilty today?

7          A.      Yes.

8          Q.      Okay.  Now, I want, the court at this time

9    wants to make it clear for the record that based on the

10   responses to my questions from Mr. Quinlan, my

11   observations of him in court today and how he is

12   responding, representation of Mr. Taylor, representation

13   of Mr. Miller, that he has no information in preparing for

14   trial that would cast any doubt on Mr. Taylor's opinion of

15   competency and I concur.  I find that the defendant,

16   Robert Michael Quinlan, is fully competent to understand

17   these proceedings and enter into a knowing, voluntary and

18   intelligent plea.

19          Mr. Quinlan, have you had an ample opportunity

20   to discuss your case with Mr. Taylor?

21         A.      Yes, I have.

22         Q.      Are you satisfied with his representation?

23         A.      Yes, I am.

24         Q.      Now, I want to remind you that your case is

25   set for jury trial, 9 o'clock on Monday, September 10th.

1    The jurors have already been contacted so there is no

2    question that if you want your constitutional right to a

3    jury trial, that process will stand, 9 o'clock a.m.

4    Monday, September 10th.  Do you understand that?

5        A.    I understand that.

6        Q.    That's your right.  You have got that

7    constitutional right and you have asked for it and I have

8    set it up.  Sort of like teeing up the baseball or the

9    golf ball, it's already to go.  But you, and only you, can

10   give it up.  Do you understand that?

11       A.    Yes, I do.

12       Q.    The government can't take it away.  They

13   can't say, you know, Judge, my wife says I would like a

14   vacation on my day, she is sick, the kids are sick, that's

15   tough, Mr. Miller, you are here Monday at nine o'clock or

16   you will be held in contempt; you better have somebody

17   else here, you are going to trial.

18             The same thing if Mr. Taylor said that, you

19   know, Judge, I have got a lot of cases, I need to meet

20   with other people and talk to them about the case.  That's

21   tough, Mr. Taylor, you have got one case on Monday morning

22   and you have got that for the next four days.  It's Robert

23   Michael Quinlan's case because he has got his

24   constitutional right to a jury trial.  And no matter what

25   my wife or family wants to do, I am going to be here, too.

 1                    So we are all ready to go and nobody can

 2      take that right to a trial by jury away from you except

 3      you, you can give it up, you can waive it, but nobody can

 4      take it away from you.

 5                    Do you understand that?

 6          A.      Yes.

 7          Q.      Now, have you ever been involved in a jury

 8      trial before?

 9          A.      I have been a juror before.

10          Q.      And in Iroquois County?

11          A.      Yes.

12          Q.      Now, that's a good point and something that

13      we want to talk about.  I want to make sure you understand

14      the differences of our jury process here because I used to

15      be a state court judge and what I did in East Peoria

16      County and the four counties surrounding them when I had

17      jury trials and the Tenth Circuit is a little different

18      than what I do here today in federal court.  I want to go

19      through so there is no question as to how the jury trial

20      will proceed here.  A lot of things I am going to say you

21      know from being a prior juror.

22                    We have, and, of course, growing up in the

23      Watseka area you know where Kankakee County and Bradley,

24      Bourbonnais and Manteno, and Momence, that's our north end

25      of our district.  Illinois Route 1, it comes down along

 1        the Illinois/Indiana border.  It goes all the way down to

 2        Paris, Illinois, so from Kankakee County down to Paris,

 3        Illinois, potential jurors.

 4                Then from I-57, which you know runs south of

 5        Chicago through Will County and comes into Kankakee County

 6        and Iroquois County which you are familiar with, comes

 7        down through Champaign, Rantoul, all the way through the

 8        far end of our district, Charleston, Mattoon, Tuscola.  It

 9        also goes along I-74 from the Indiana border, I-72 over to

10        Decatur, so our jurors come from Kankakee, Danville,

11        Champaign-Urbana, Decatur, Charleston, Mattoon, and all of

12        the small towns that surround that.

13                So the jurors here would be a far bigger array

14        and a far wider cross-section of East Central Illinois

15        than just Iroquois County.

16                Also, since I have 40 jurors coming, I have the

17        ability, myself, and I guarantee you I do it in every

18        trial, somebody says I know Bob Quinlan, well, that person

19        is gone.  I know that witness in this case, I know that

20        police officer, they are gone.  I have heard of this case,

21        they are gone.

22                I can get enough jurors that I can guarantee

23        you no one will know anything about you, your case, none

24        of the potential witnesses, none of the government's

25        witnesses, not this case agent, not Mr. Miller, not even

1   your attorney.  Recently we had his secretary, as soon as

2   they said Mr. Taylor's secretary, thank you very much.

3   You are excused.

4           Because I want to make sure that you have

5   ultimately 12 jurors that judge your case not on anything

6   they have heard outside of the courtroom, not on any

7   perception of the witnesses, but only from the witness

8   stand.  They come in like a blank slate.  The only thing

9   they know is what they hear and see, the evidence, hear

10   the witnesses here, and your case is then fairly and

11   honestly judged solely on the evidence here.

12           Some of the things I am now going to say

13   probably you have heard before, but the burden is always

14   on the government.  You are presumed innocent.  The fact

15   that you are here today even talking about pleading

16   guilty, they would never know on Monday if you change your

17   mind.

18           The government's burden of proof, they have to

19   prove beyond a reasonable doubt each and every element of

20   the offense in that indictment, and only then when all 12

21   jurors unanimously agree the government has met its burden

22   beyond a reasonable doubt, could you be convicted.  Only

23   then would your presumption of innocence be overcome.

24           And instructing the jurors next Monday, one of

25   my early instructions before they are selected is if you

1    have reasonable doubt, your verdict must be not guilty.

2    You can only vote guilty if you believe the government's

3    proven its case beyond a reasonable doubt as to each and

4    every element of the offense.

5              The only way the presumption of innocence is

6    overcome, the only way Robert Michael Quinlan could be

7    found guilty is if all 12 of you unanimously agree that

8    the government has met its burden beyond a reasonable

9    doubt as to each and every element of the offense.

10              Do you have any questions about that?

11         A.    No, Your Honor, I don't.

12         Q.    Also, I remind the jurors that the burden

13    never shifts.  It's always on the government.  The

14    presumption of innocence always is on you and it remains

15    throughout the trial and goes into the jury room.

16              So any juror that would accidentally say

17    doesn't he have to testify, doesn't he have to prove

18    himself innocent, no, we correct that person, they are

19    excused and we inform all the other jurors the burden

20    never shifts to you.  You never have to prove anything.

21    You have no requirement to testify.  You have a

22    constitutional right to remain silent, no obligation to

23    present evidence because the sole focus of the trial is

24    always on the government, beyond a reasonable doubt.  It

25    never shifts and it never changes.

 1              And then I always instruct the jury that they

 2    cannot use your constitutional right to remain silent, the

 3    fact that you didn't testify against you, they cannot use

 4    the fact that you did not present evidence.  You have that

 5    right.  And they cannot consider that in any way in

 6    determining whether the government has met its burden

 7    beyond a reasonable doubt.

 8              Do you have any questions about that?

 9         A.      No, Your Honor, I don't.

10         Q.      The government can't call you as a witness,

11    it can't make you take the stand and cross examine you.

12    That's called your right of self-incrimination.

13              The jury process, you may have participated in

14    and you may have done jurors four at a time in panels.  I

15    bring in 28 jurors and when I am satisfied all 28

16    understand the rules I am talking about, the rights that

17    you have, and that they can be fair and impartial, that

18    they have no prior judgments, they have no prejudice, when

19    I am satisfied with all 28, then you and Mr. Taylor and

20    Mr. Miller, of course, may ask to excuse them for cause

21    and I will determine whether that's correct; and, if I do,

22    I replace them with another juror just like I would any

23    juror if I think, I didn't think would be fair and

24    impartial so ultimately there is 28 jurors in there from

25    the courtroom qualified.

1           You and Mr. Taylor together get to excuse 10,

2     the government 6.  And the 16 from 28 gives us the 12 who

3     would proceed to hear the evidence in your case Monday

4     afternoon and the rest of next week.

5                 Any question about that process?

6           A.    No, Your Honor, there is not.

7           Q.    By pleading guilty, you give up the right

8     next Monday to see the jurors, the right to select, help

9     select those jurors, the right to have Mr. Taylor object

10    to jurors, the right for Mr. Taylor on your behalf to

11    object to evidence, to object to the government's

12    questions.

13                You give up the right to turn to Mr. Taylor

14    and say, you know, that guy, he doesn't like me because

15    two years ago I sold him a car and he didn't like the car

16    and he says I will get even with you, when I told him I

17    sold it to him as is.  So you, through Mr. Taylor, have a

18    right to assist in the cross examination of witnesses to

19    cast doubt on their, what they can see, what they heard,

20    what they know and their interests and their biases

21    against you, to cast doubt on the government's case, to

22    cast reasonable doubt, to put that in the mind of the

23    jurors.

24                You give up those rights and the right to call

25    your own witnesses to the stand to cast doubt.  And just

1     like you have the right to remain silent, you also have

2     the right to take the stand and tell your story to cast

3     doubt on the government's case.  You are not required to,

4     but you also have those rights.

5              By pleading guilty today, all of those rights

6     are given up, no jury, no jury selection, no objection to

7     evidence, no cross examination, no right to testify, put

8     on evidence, none of that will happen next week if you

9     plead guilty today.  Do you understand that?

10         A.     Yes.

11         Q.     Is that how you still wish to proceed?

12         A.     Yes.

13         Q.     Again, has anybody forced you, threatened

14    you or promised you anything to give up that jury process

15    next week?

16         A.     No.

17         Q.     Do you have questions now about anything

18    further that I have said?

19         A.     I can't think of anything at the moment.

20              THE COURT:  Mr. Miller, would you explain

21    in a precise and meaningful manner the essential elements

22    of the offense?

23              MR. MILLER:  Your Honor, the three elements

24    of the offense of conspiracy to manufacture

25    methamphetamine involving more than five grams, each of

1    which the government would have to prove beyond a

2    reasonable doubt.  That the conspiracy as charged in Count

3    1 of the indictment existed.  Second, that the defendant

4    knowingly became a member of the conspiracy with the

5    intention to further the conspiracy.  And, third, that the

6    conspiracy involved five grams or more of methamphetamine.

7                As we note there, the agreement between two or

8    more persons to accomplish an unlawful purpose and it may

9    be established even if its purpose was not accomplished.

10                    THE COURT:  Mr. Taylor, do you agree those

11    are the elements of the offense?

12                    MR. TAYLOR:  I have, Your Honor.

13                    THE COURT:  Have you discussed them with

14    Mr. Quinlan?

15                    MR. TAYLOR:  I have, Your Honor.

16                    THE COURT:  Do you believe he understands

17    them?

18                    MR. TAYLOR:  I do, Your Honor.

19                    THE COURT:  Mr. Quinlan, do you have any

20    question about the elements of the offense that Mr. Taylor

21    has just said?

22                    THE DEFENDANT:  No, Your Honor I don't.

23                    THE COURT:  Do you have a copy of that, Mr.

24    Taylor, of what was filed by the government?

25                    MR. TAYLOR:  We do, and I have shared it

1    with my client.

2                    THE COURT:  And that's the document that is

3    in front of Mr. Quinlan?

4                    MR. TAYLOR:  Yes, Your Honor.

5                    THE COURT:  So the elements of the offense

6    are set forth on page 2 at the top.  You have had a chance

7    to review them; is that right, Mr. Quinlan?

8           A.      Yes.

9           Q.      You have no question about those elements;

10   is that right?

11          A.      That's right.

12          Q.      Now, the potential penalties, I have

13   already listed them and read them to you and we have

14   talked about them.  They are shown in paragraphs 5 and 6.

15   Do you have any questions about those potential penalties,

16   the maximum penalty you face?

17          A.      No, Your Honor, I don't.

18          Q.      Now, the one thing that's very important to

19   know is that there is a period of supervised release and

20   that's discussed on the top of page 3, paragraph 7, that

21   at the time of your sentencing do you understand that you

22   will be sentenced to the Federal Bureau of Prisons.  This

23   is not a case where the court would give probation.  Do

24   you understand that?

25          A.      Yes, I do.

1      Q.      And so after you would be released from the

2   Federal Bureau of Prisons you would be placed on

3   supervised release, 4 to 5 years, and you would be

4   required not to violate any law of any jurisdiction,

5   federal, state or local.  But even more important, you

6   would be required not to possess, own, or purchase a

7   firearm or ammunition.  Once you are a felon, you can

8   never do that from hence forth.  Also, that you would be

9   restricted on consuming alcohol, possessing or using

10  drugs.  Tests would be done to see if you have used

11  alcohol or drugs.

12          The probation officers would want to know

13  where you lived, have you report where you are working so

14  that there would be a lot of things that you would be

15  required to do on supervised release.  If you failed to do

16  them successfully, violated a law or just said I am not

17  talking to you and I am not telling you where I live, I am

18  not reporting, so it could be a violation of law, or it

19  could be the violation of the terms of supervised release

20  and they would give you notice that you violated it.

21          And if I found that you had violated it by

22  a preponderance of the evidence, your supervised release

23  would be revoked and you could be sent back to the Federal

24  Bureau of Prisons.  Do you understand that?

25      A.      Yes.

1          Q.       Any questions about that or any of the

2    potential penalties on page 2 or 3?

3          A.       Yes, the part about they would be testing

4    me, the fact that I do take pseudoephedrine for health

5    reasons?

6          Q.       You can continue to do that.  You would not

7    be restricted in your medication and they would take that

8    into consideration.  I will give you an example.  This is

9    a sophisticated test that comes back and would say things

10   like opiates that wouldn't be part of that, marijuana,

11   wouldn't be part of that.  So this wouldn't be a test

12   where there would be a false positive because of

13   pseudoephedrine.  This would be a test that would for a

14   whole range and it would be done by an independent

15   chemical lab that has nothing to do with the federal

16   government.

17         A.       Yes, but there would be a record to the

18   fact that I would be buying it, pseudoephedrine, from

19   over-the-counter.

20         Q.       You would have to have the permission from

21   the Probation Office because it was prescribed to you for

22   your condition by a doctor?

23         A.       Yes.

24         Q.       I just want you to know that we are not

25   trying to trick you, but you would have to have a doctor's

1    prescription to show that you needed it.

2            A.      Yes, I have this now.  Would we have to do

3    it again when I got out?

4            Q.      Right.

5            A.      I would have to have another one?

6            Q.      Yes.  Any questions about that?

7            A.      No.

8            Q.      Now, if I accept your guilty plea today,

9    and enter judgment of conviction and vacate the trial that

10   is set for Monday, do you understand that you would not be

11   allowed to withdraw your plea of guilty later because, in

12   effect, you had buyer's remorse, changed your mind,

13   somebody in the jail said, gee, you should never have done

14   that, you should have had your trial.  Do you understand

15   if I accept your plea today, that will be final and we

16   will proceed to sentencing in this case?

17           A.      Yes, I understand.

18           Q.      And that's how you wish to proceed, right?

19           A.      That's how I wish to proceed.

20           Q.      Okay.  Now, today -- while at trial next

21   week nobody could call you, to call you to the stand,

22   nobody could make you answer questions.  Do you understand

23   today you would be giving up also your right against self

24   incrimination?  Because for me to satisfy myself that you

25   are pleading guilty freely and voluntarily and you are

1    pleading guilty to the elements of the offense I will have

2    to ask you questions about what you are charged with to

3    satisfy myself that you are pleading guilty to the

4    elements and that you are pleading guilty because you are

5    in fact guilty.  So do you understand that?

6         A.    Yes, I do.

7         Q.    So having discussed the rights you give up,

8    the right to a trial by jury, the right against

9    self-incrimination, do you still wish to proceed with the

10   plea of guilty?

11        A.    Yes, I do.

12        Q.    Mr. Miller, what would be a factual basis

13   for the defendant's plea?  What evidence would you present

14   next week to a jury that the government believes would

15   cause a reasonable jury, to cause a reasonable jury to

16   accept that testimony and convict Mr. Quinlan beyond a

17   reasonable doubt of the elements of the offense charged in

18   the indictment?

19             MR. MILLER:  The evidence the United States

20   is prepared to present to the jury next week includes that

21   pseudoephedrine can be used as a precursor chemical in the

22   unlawful manufacture of methamphetamine.  Therefore,  the

23   sale of products containing pseduoephedrine has been

24   restricted by the laws of the State of Illinois, State of

25   Indiana, and the State of Wisconsin, and the United States

1    to prevent pseudoephedrine from being used to illegally

2    manufacture methamphetamine.  To attempt to evade these

3    restrictions, the defendant, Robert Michael Quinlan,

4    including several co-conspirators, including Daniel

5    Caswell and Jessica Patterson, purchased products

6    containing pseudoephedrine at different retail locations,

7    including in different states, at different times.  The

8    defendants caswell and Patterson also recruited others to

9    purchase products containing pseudoephedrine for them by

10   offering either money or methamphetamine in exchange for

11   their assistance.

12                    The defendants Caswell and Patterson then

13   used the pseudoephedrine that they had obtained to

14   illegally manufacture methamphetamine.

15                    Records of various stores such as

16   Wal-Mart, CVS and Walgreens located in Illinois, including

17   Watseka, Illinois in the Central District of Illinois,

18   Indiana and Wisconsin establish that from February 21,

19   2006 to April 29, 2007, the defendant purchased at least

20   22 boxes containing 440 pills of 120 milligrams of

21   pseudoephedrine, for a total of 52.8 grams of

22   pseudoephedrine.   Records of the same stores and during

23   the same time period establish that during this same time

24   period coconspirator Daniel Caswell purchased at least

25   nine boxes containing 180 pills of 120 milligrams for a

1    total of 21.6 grams of pseudoephedrine and that Jessica

2    Patterson purchased at least 7 boxes containing 140 pills

3    of 120 milligrams of pseudoephedrine for a total of 16.8

4    grams of pseudoephedrine.

5             During the same time period the logs establish

6    that several other coconspirators obtained boxes of

7    pseudoephedrine for the defendant's use in manufacturing

8    methamphetamine, including I would note sometimes only 10

9    or 15 minutes apart from the same time the defendant

10    purchased his pseudoephedrine.  The 52.8 grams purchased

11    by the defendant alone was converted into well in excess

12    of 5 grams of methamphetamine.

13             During the course of the conspiracy, the

14    defendant Caswell traveled together to various anhydrous

15    ammonia tank farms in Iroquois County and elsewhere,

16    where Caswell stole anhydrous ammonia from the tanks and

17    placed it in an improvised container, such as a gallon

18    milk jug with a funnel consisting of an uside down 2 liter

19    plastic bottle with the bottom cut off attached to the

20    milk jug opening with electrical tape.

21             At least 20 times from March of 2006 to July of

22    2006 the defendant and Caswell went to various rural

23    locations in Iroquois County, including Sugar Creek Bridge

24    which is also known as Schlief's Bridge, near 950 North

25    2720 East County Road and Miller's Bridge, near 760 North

1    2040 East County Road, where they used the pseudoephedrine

2    pills, anhydrous ammonia, and other items such as lithium

3    batteries, camp fuel, coffee filters,  funnels,  jars

4    drain cleaner, salt and tubing to manufacture

5    methamphetamine.

6         During the course of the conspiracy they

7    manufactured well in excess of five grams of actual

8    methamphetamine.  After manufacturing the metamphetamine,

9    they weighed it and split it between themselves, as well

10   as provided a small amount to any person who had provided

11   them with any of the pseudoephedrine pills.

12        After Caswell was arrested in July of 2006, the

13   defendant continued to obtain pills himself and from

14   others to manufacture methamphetamine.

15        On August 2, 2006, Trooper Ken Massey of the

16   Illinois State Police located a methamphetamine lab dump

17   site near Miller's Bridge, consisting of items typically

18   used in the manufacture of methamphetamine, including

19   plastic one gallon jars, white jar lids, one of which had

20   a hole drilled in it, rubber gloves, pliers, plastic

21   funnels, and yellow Dollar General bags.  A coconspirator

22   who lived on the only road leading to the dump site,  as

23   well as a coconspirator who had bought pills for the

24   defendant, had both observed the defendant and Caswell on

25   occasions go together to Miller's Bridge around midnight

1    or later.  The defendant and Caswell provided the

2    coconspirator living near Miller's Bridge with

3    methamphetamine in exchange for him acting as a lookout

4    for persons traveling down the road.

5               On November 14, 2006, troopers with the

6    Illinois State Police conducted surveillance on the

7    defendant's residence at 212 West Frederick Street,

8    Milford, Illinois.  Around 9:08 p.m. they observed the

9    defendant leave his residence in his black Plymouth Duster

10   and drive towards the area of the Sugar Creek Bridge.

11   The defendant returned and left again, this time with the

12   coconspirator (who purchased 3 boxes of pseudoephedrine

13   pills in the previous 40 days) driving.  The coconspirator

14   drove to the Sugar Creek Bridge and stopped.

15               After the vehicle left the bridge, the troopers

16   pulled it over because the coconspirator's license was

17   suspended.  She admitted she dropped off the defendant at

18   the Sugar Creek Bridge.  A little while later the

19   defendant was observed walking a short distance from the

20   Sugar Creek Bridge.  He was carrying items typically used

21   in manufacturing methamphetamine, including a funnel with

22   the end cut off, an open package of coffee filters, vice

23   grips, two flashlights, and a yellow Dollar General bag.

24               A short time later,  in the early hours

25   of November 15, 2006, the troopers went to Sugar Creek

     1    Bridge where they found a clandestine methamphetamine lab

     2    under the bridge, including an improvised anhydrous

     3    ammonia container consisting of a one gallon plastic milk

     4    jug, with a two liter plastic bottle taped together at the

     5    openings by electrical tape, empty packaging for lithium

     6    batteries, stripped lithium batteries, five coffee filters

     7    with white and pink pill matter residue, and two empty one

     8    gallon containers of Ozark travel camp fuel.  The milk jug

     9    contained a liquid and had frost on the bottom, which is

    10    consistent with containing anhydrous ammonia.    The

    11    troopers performed a Draeger test, D–R–A–E–G–E–R test,

    12    which confirmed the presence of anhydrous ammonia.

    13                    The filters were seized from the

    14    defendant.

    15                    THE COURT:  I want to stop you there.

    16    This is where I am missing something.  Leading up to this

    17    I don't see where the troopers have the defendant in

    18    custody.

    19                    MR. MILLER:  He was not.  In this case,

    20    Your Honor, he was released he was not arrested on that

    21    occasion.

    22                    THE COURT:  So when it says "seized from

    23    the defendant," is that in the early morning hours of

    24    November 15th or is that some time later?

    25                    MR. MILLER:  It was seized from him at

1    the time that he is walking from the bridge, Your Honor,

2    and he has the coffee filters in his pockets.

3                    THE COURT:  So the state troopers

4    approached him and then seized from him in the early

5    morning hours of November 15, 2006, the coffee filters,

6    and sections of electrical tape from the improvised

7    anhydrous ammonia container?

8                    MR. MILLER:  Yes.  I will try to make

9    this clear.

10                    THE COURT:  Who had the improvised

11    anhydrous ammonia?

12                    MR. MILLER:  There were two seizures.

13    The defendant was stopped walking a short distance from

14    Sugar Creek Bridge.  In his possession at that time he had

15    a funnel with the end cut off, he had an open package of

16    coffee filters, wire cutters, vice grips, and the yellow

17    Dollar General bag.

18                    He told them he was out for a walk and

19    then he told him he was coon hunting.  They asked him

20    where his gun was and he said he didn't use them.  This

21    was out in the cornfields.

22                    Later, after that evening, after finding

23    these items on the defendant where he was then released,

24    they then went to Sugar Creek Bridge where the

25    coconspirator had dropped him off at, and at the bridge,

1    underneath the bridge they found this improvised anhydrous

2    ammonia container.  They consider the stripped lithium

3    batteries, five coffee filters with pink matter residue

4    and one gallon container of Ozark travel camp fuel.

5                    As we said, the improvised anhydrous

6    ammonia container tested positive for the presence of

7    anhydrous ammonia.

8                    THE COURT:  Did they find him in physical

9    possession of that?

10                    MR. MILLER:  Of those items, what they

11    did, they sent the filter that was found in the possession

12    of the defendant to the crime lab and that filter tested

13    positive for both methamphetamine and pseudoephedrine.

14    They then sent the residue from the coffee filters from

15    the scene to the crime lab and they were found to contain

16    pseudoephedrine or ephedrine.  And they sent the electric

17    tape that was found at the last site underneath the bridge

18    to the crime lab for latent prints.

19                    As we note here, Forensic Scientist Lauren

20    Wicevic, W-I-C-E-V-I-C, determined that the electrical

21    tape contained two latent fingerprints that had been made

22    by the defendant.

23                    And we believe that that evidence would be

24    sufficient to sustain the defendant's conviction on the

25    counts of the indictment in conspiracy to manufacture

1    methamphetamine involving more than five grams.

2              Thank you, Your Honor.

3              THE COURT:  Now, Mr. Taylor, you started

4    out this morning, you have indicated there would be

5    evidence beyond a reasonable doubt that could cause a jury

6    to convict Mr. Quinlan, that you believe reasonably could

7    cause a jury to convict Mr. Quinlan of the elements of the

8    offense and charged in the indictment.  Is that correct

9              MR. TAYLOR:  That's correct, Your Honor.

10              THE COURT:  And then that you said there

11   would be some facts that would be in dispute at the time

12   of sentencing.

13              MR. TAYLOR:  That's correct, Your Honor.

14              THE COURT:  So there is discovery that

15   would support some of the factual basis.  You are not

16   admitting all of the factual basis, but you believe, no

17   question, enough to support beyond a reasonable doubt the

18   elements of the offense that Mr. Quinlan would plead

19   guilty to today?

20              MR. TAYLOR: That's correct, Your Honor.

21              THE COURT:  Now, Mr. Quinlan, you are not

22   going to be telling me here in the next few minutes, are

23   you, that you are a guy that's just got a cold,

24   congestion, and happened to be somewhere near some bad

25   people and now you have been drug into this, are you?

1              A.      No.

2              Q.      You were involved in the manufacture of

3      methamphetamine, right?

4              A.      Yes, I was.

5              Q.      And you understand how methamphetamine is

6      manufactured, right?

7              A.      Yes.

8              Q.      And in the indictment it says, that "from

9      on or about March 2006 and continuing through at least

10     November 15, 2006, in Iroquois County in the Central

11     District of Illinois, you were knowingly and intentionally

12     conspiring with others to manufacture methamphetamine."

13     Is that correct?

14             A.      That's correct.

15             Q.      And this conspiracy involved five grams or

16     more of methamphetamine.  Is that correct?

17             A.      Correct.

18             Q.      And the conspiracy with you and others was

19     to obtain quantities of pseudoephedrine and other

20     precursors which could then be manufactured into

21     methamphetamine; is that right?

22             A.      Just a second, I need to ask a question.

23                     (Mr. Quinlan confers with his attorney.)

24                     THE DEFENDANT:   Your Honor, the majority

25     of them may have been for methamphetamine but a lot of

1    them are for my cold and congestion.

2           Q.     But you are not denying that the conspiracy

3    involved obtaining quantities of five grams or more of

4    meth -- to be manufactured into methamphetamine?

5           A.     That's correct.

6           Q.     And when they said that you went to various

7    stores in the Central District of Illinois and elsewhere

8    from February 21st, 2006, to April 9, 2006, and they have

9    got records showing that you purchased at least 22 boxes

10   containing 440 pills of pseudoephedrine, you are not

11   denying that, are you?

12          A.     We are.

13                 MR. TAYLOR:  May I address that, Your

14   Honor.

15                 THE COURT:  Yeah.  This is -- he has got to

16   admit something.  We are splitting hairs here.  All I am

17   trying to do is get the minimum and if we don't have that,

18   let's go to trial.  If we don't have him purchasing

19   pseudoephedrine in excess of his cold needs?

20          A.     I did that, Your Honor.

21          Q.     So you are not denying when you were buying

22   these pills some of them were for you, and some of them

23   were for the conspiracy, right?

24          A.     Correct.

25          Q.     And you knew that these other people were

1        going to take these boxes that you didn't use and you knew

2        that they were going to use them to make methamphetamine?

3        A.      Yes.

4        Q.      And you are not denying that you were

5        involved in the manufacture of more than five grams,

6        right?

7        A.      Right.

8        Q.      Now, you also know what anhydrous ammonia

9        is used for on farms but it's also used for manufacture of

10       methamphetamine, right?

11       A.      Correct.

12       Q.      And you knew that these people you were

13       conspiring with were trying to get anhydrous ammonia not

14       for farm purposes but to make methamphetamine?

15       A.      Yes.

16       Q.      And while this conspiracy is going on that

17       you participate in, you didn't stop and say, you know

18       what?  I want out.  You didn't stop and say, I am not

19       going to do this.  You participated in it, didn't you?

20       A.      Yes.

21       Q.      And so you knew what the conspiracy was

22       about, right?

23       A.      Yes.

24       Q.      We need to get pseudoephedrine, we get

25       anhydrous ammonia and some of these other items and

 1   manufacture metamphetamine and you knew how to do that,

 2   right?

 3          A.     Yes.

 4          Q.     You knew what these other people wanted to

 5   do and you participated in that?

 6          A.     Yes.

 7          Q.     What I have been doing is slowly going

 8   through the indictment to see if you are pleading guilty

 9   in effect to the matters in the indictment, and that's

10   what you are doing, right?  Not to the factual basis that

11   Mr. Miller said.  That's in dispute.  But you are not

12   disputing what's in the indictment, are you?

13          A.     No, I am not.

14          Q.     So then you knew that obtaining

15   pseudoephedrine in excess of what you needed so that that

16   excess pseudoephedrine would be used to illegally

17   manufacture methamphetamine, you knew that that was

18   illegal, right?

19          A.     Yes.

20          Q.     And that the people you were involved with

21   in this conspiracy, that all of you were involved in an

22   illegal activity; you knew that?

23          A.     Yes.

24          Q.     And they knew that, too, right?

25          A.     Yes.

 1            Q.      And all of you participated in the

 2    conspiracy together to obtain and use pseudoephedrine to

 3    ultimately obtain pseudoephedrine and other precursors to

 4    illegally manufacture methamphetamine.  Is that correct?

 5            A.      Correct.

 6            Q.      So you are pleading guilty to the

 7    indictment because you are guilty of what's contained in

 8    the indictment?

 9            A.      Yes.

10            Q.      Do you have any doubt about that?

11            A.      Nothing.

12            Q.      That those things in that indictment, you

13    did?

14            A.      Yes.

15            Q.      And so when we talk about the elements of

16    the offense, that there was a conspiracy, you have

17    admitted that, right?

18            A.      Yes, I did.

19            Q.      And that you knowingly became a member of

20    the conspiracy to help further, meaning to help ultimately

21    manufacture meth?

22            A.      Yes.

23            Q.      And that that conspiracy involved 5 or more

24    grams of meth?

25            A.      Yes.

1          Q.      And that you and other people, so at least

2    there is two of you or more, conspired to accomplish that

3    unlawful purpose?

4          A.      That's right, Your Honor.

5          Q.      And that you knowingly did that.  You were

6    aware that this what illegal, you were aware that what you

7    were doing was the manufacture of metamphetamine, and this

8    wasn't an accident or mistake, you were involved with the

9    conspiracy to manufacture metamphetamine, you knew how to

10   do it, and you knew it was illegal?

11         A.      Yes.

12         Q.      So you're pleading guilty to the indictment

13   because you are in fact guilty?

14         A.      That's right.

15         Q.      No doubt about that?

16         A.      No doubt.

17         Q.      And you're asking me now to accept your

18   plea of guilty, vacate your jury trial set on Monday, set

19   the matter for sentencing, that's what you want me to do?

20         A.      Yes.

21                 THE COURT:  The court at this time finds

22   that Robert Michael Quinlan is fully competent to enter

23   into this plea, that he is fully intelligent to make a

24   knowing and intelligent free and voluntary plea, that he

25   has been asked several times and he has been very

1    consistent that no one forced him, threatened him or

2    promised him anything to get him to do that.

3                    The court has gone through the elements

4    of the offense which he has admitted.  The court has made

5    him aware of the constitutional right to a trial by jury,

6    which he is waiving, constitutional right to remain

7    silent, which he waived, that he has made admissions today

8    sufficient to convince the court that he did in fact

9    commit the offense charged in the indictment.  He has in

10   fact admitted the elements of the offense supporting it.

11   He understands the maximum and minimum penalties he faces

12   under the law for his plea.  That he is doing this freely,

13   voluntarily, knowingly and intelligently, the court

14   accepts the plea, enters judgment of conviction on the

15   matter contained in the indictment.  Vacates the jury

16   trial setting of Monday, September 10th, relieves the

17   jurors of their obligation to be here, vacates the

18   obligation of Mr. Miller and Mr. Taylor and Mr. Quinlan to

19   be here.  Orders probation to prepare a presentence

20   investigation report, and we will set this matter for

21   sentencing at least 120 days out, which will put us where,

22   in December?

23                    THE CLERK:  Yes.

24                    THE COURT:  Okay.  We will go off the

25   record to talk about a time that will be convenient to the

```
1      schedule of Mr. Miller and Mr. Taylor.

2                       (Off record discussion.)

3                  THE COURT:  Back on the record.  The court

4      usually sets these matters 90 to 120 days out and 103 days

5      out is December 19th.  The court will not have a trial

6      that week.  Mr. Taylor is here at 11 so I know he can be

7      here at 9:30.  Is that correct, Mr. Taylor?

8                  MR. TAYLOR:  That's correct, Your Honor.

9                  THE COURT:  Mr. Miller, while we haven't

10     scheduled you yet on that date, can you be here?

11                 MR. MILLER:  Yes, Your Honor.

12                 THE COURT:  That should be sufficient time

13     for probation to prepare the presentence report.  The

14     court will set the sentencing for Robert Michael Quinlan

15     at 9:30 on Wednesday, December 19th, 2007.  Any questions,

16     Mr. Quinlan?

17                 THE DEFENDANT:  No, Your Honor.

18                 THE COURT:  Anything further from the

19     government, Mr. Miller?

20                 MR. MILLER:  No, Your Honor.

21                 THE COURT:  Anything further, Mr. Taylor?

22                 MR. TAYLOR:  No, thank you, Your Honor.

23                 THE COURT:  That's all for the record.

24     The defendant is remanded to the custody of the marshal.

25     The defendant will be brought back here at 9:30,
```

1    **Wednesday, December 19th.**

2

3

4

5

                    **COURT REPORTER'S CERTIFICATE**

6

        **I, TONI M. JUDD, United States Court Reporter,**

7

    **hereby certify that the foregoing is a true and**

8

    **accurate transcript from the Record of Proceedings in**

9

    **the above-entitled matter.**

10

11            **Dated this 16th day of April, 2008.**

12

13

                        **S/Toni M. Judd**

14        _____

15            **Toni M. Judd, U.S. Court Reporter**

16

17

18

19

20

21

22

23

24

25